UNITED STATES of America,
Plaintiff,

v.

Angela JOHNSON, Defendant.

No. CR 01–3046–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Jan. 3, 2005.

Alfred E. Willett, Terpstra, Epping & Willett, Cedar Rapids, IA, Dean A. Stowers, Rosenberg, Stowers & Morse, Robert R. Rigg, Des Moines, IA, Patrick J. Berrigan, Watson & Dameron, LLP, Kansas City, MO, for Defendant.

Charles J. Williams, Patrick J. Reinert, U.S. Attorney's Office, Cedar Rapids, IA, Thomas Henry Miller, Des Moines, IA, for Plaintiff.

**MEMORANDUM OPINION AND ORDER REGARDING PRETRIAL MOTIONS**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. BACKGROUND ................................................946
 A. The Original And Superseding Indictments ...............946
 B. The Co–Defendant's Trial ..............................948
 C. The Pretrial Motions In Johnson's Case ................950

II. LEGAL ANALYSIS ..........................................950
 A. The Government's Motions ..............................950
 1. The motion to exclude alibi defense ..............950
 a. Arguments of the parties ...................950
 b. Analysis ...................................951
 i. Rule 12.1 ............................951
 ii. Johnson's non-compliance ............951
 iii. The appropriate remedy ..............953
 2. The motion for an anonymous jury .................955
 a. Arguments of the parties ...................955
 b. Analysis ...................................955
 3. The motion to admit evidence of defendant's attempted suicide .......956
 a. Arguments of the parties ...................957
 b. Analysis ...................................957
 4. The motion to admit statements by decedents .....959
 a. The statements in question .................959
 i. Statements by DeGeus ................959
 ii. Statements by Nicholson .............960
 b. Admissibility of DeGeus's statements .......960
 i. Arguments of the parties. ...........960
 ii. Analysis ............................962
 c. Admissibility of Nicholson's statements ....969
 i. Arguments of the parties ............969
 ii. Analysis ............................969
 5. The motion to exclude evidence on aspects of the death penalty .....970
 a. Arguments of the parties ...................970
 b. Analysis ...................................971
 i. Jury selection v. "guilt phase" .......971
 ii. Death penalty issues that "arose" in conversations .........972
 iii. Deterrent effect of the death penalty .......972
 6. The motion to exclude evidence of Cutkomp's instances of public exposure ......974
 a. Arguments of the parties ...................974
 b. Analysis ...................................975
 7. The motion to admit a replica firearm ............976
 a. Additional factual background ..............976
 b. Arguments of the parties ...................976
 c. Analysis ...................................976

**946**

 B. **Johnson's Motions** .......................................................978
 1. *The motion for change of venue* ....................................978
 a. *Arguments of the parties* ....................................978
 b. *Analysis* ....................................................980
 i. *Applicable law* ....................................980
 ii. *Application of the law* ............................985
 2. *The motion for factual findings* ....................................989
 a. *Arguments of the parties* ....................................989
 b. *Analysis* ....................................................990
 3. *The motion in limine for evidence suppressed as to the first indictment* ....................................................991
 a. *Arguments of the parties* ....................................991
 b. *Analysis* ....................................................992
 4. *The motion to suppress McNeese's evidence* ........................993
 a. *Additional evidence* ........................................993
 b. *Arguments of the parties* ....................................993
 c. *Analysis* ....................................................994
 5. *Request for Honken trial transcript* ...............................995

III. **CONCLUSION** ...........................................................995

## I. BACKGROUND

### A. The Original And Superseding Indictments

Four and one-half years after the first of two indictments against the defendant, and more than eleven years after the defendant allegedly participated in the five murders upon which most of the charges against her are based, the defendant's trial is now merely months away. Therefore, the court must now resolve the first round of pretrial motions in this case, including some motions that were held in abeyance during the trial of a co-defendant, who was convicted and given a death sentence by a jury, as well as several newly-filed motions. These cases, and the companion case against the co-defendant, have engendered unprecedented publicity in Iowa, in part, because they are federal death-penalty cases in a state that does not, itself, have the death penalty. For these and other reasons, the government moved for an "anonymous" jury and the defendant moved for a change of venue. Numerous other motions are also before the court. Even where the parties' motions seem to tread familiar ground, already traversed in the co-defendant's case, differences in circumstances may make the path to resolution of those motions anything but clear, and entirely new issues may place the court and the parties in terra incognita.

In two separate indictments, a grand jury charged defendant Angela Johnson with a variety of charges arising, principally, from her alleged involvement in the murders in 1993 of five witnesses to the drug-trafficking activities of Johnson's sometime boyfriend, Dustin Honken. The grand jury handed down the first seven-count indictment on July 26, 2000, and the second ten-count indictment on August 30, 2001. On April 25, 2002, the government filed its original notice in each case of its intent to seek the death penalty on all of the charges against Johnson relating to the murder of witnesses, that is, Counts 1 through 5 of the first indictment and all ten of the charges in the second indictment. Those notices identified the statutory aggravating factors that the government contends warrant the imposition of the death penalty under the applicable death penalty statutes.

On August 23, 2002, the government filed superseding indictments in both cases against Johnson. The superseding indictment in the first case against Johnson,

Case No. CR 00–3034–MWB, reiterated and expanded the seven counts of the original indictment. It charged the following offenses: five counts of aiding and abetting the murders of witnesses Gregory Nicholson, Lori Duncan (Nicholson's friend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10, respectively), and Terry DeGeus, respectively, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (C), 1512(a)(2)(A) or 1513(a)(1)(A) and (C),[1] 1111, and 2; one count of aiding and abetting the solicitation of the murders of witnesses Timothy Cutkomp and Daniel Cobeen, in violation of 18 U.S.C. §§ 373(a)(1) and 2; and one count of conspiracy to interfere with all seven witnesses, in violation of 18 U.S.C. § 371.

The August 23, 2002, superseding indictment in Case No. CR 01–3046–MWB, like the original indictment in that case, charged Johnson with five counts of killing witnesses while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; and five counts of killing the same witnesses in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. More specifically, Counts 1 through 5 of the superseding indictment in Case No. CR 01–3046–MWB charged that, on or about July 25, 1993, or in the case of Terry DeGeus, on or about November 5, 1993, while engaging in an offense punishable under 21 U.S.C. § 841(b)(1)(A) and 846, relating to a conspiracy to manufacture and distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine between 1992 and 2000, Angela Johnson intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted, all in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Counts 6 through 10 of the superseding indictment charged that, on or about July 25, 1993, or in the case of Terry DeGeus, on or about November 5, 1993, while working in furtherance of a continuing criminal enterprise between 1992 and 2000 in violation of 21 U.S.C. § 848(c), Angela Johnson intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted, all in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

On September 24, 2002, after the filing of the superseding indictments, the government filed a notice in Case No. CR 00–3034–MWB withdrawing its notice of intent to seek the death penalty for violations of the witness-tampering statute, 18 U.S.C. § 1512. However, the government reiterated its intention to continue pursuing the death penalty in Case No. CR 01–3046–MWB as to the "conspiracy murder" and "CCE murder" charges pursuant to 21 U.S.C. § 848. Indeed, on November 14, 2002, the government filed a notice of intent to seek the death penalty on all ten charges in the superseding indictment in Case No. CR 01–3046–MWB.

1. The court notes that there is no subdivision (C) to 18 U.S.C. § 1513(a)(1), nor does it appear that there ever has been. *See* 18 U.S.C.A. § 1513(a) & Historical and Statutory Notes. Notwithstanding this fact, Count 1 of the superseding indictment in Case No. CR 00–3034–MWB, which alleges that Johnson aided and abetted the killing of Gregory Nicholson, alleges that the killing was, *inter alia,* "in violation of Title 18, United States Code, Sections … 1513(a)(1)(A) & (C)…." Superseding Indictment, Count 1.

Although the charges in the two indictments survived various challenges by Johnson, on November 15, 2004, the court granted the government's November 3, 2004, renewed motion in Case No. CR 00–3034–MWB to dismiss, without prejudice, counts 1–5 and portions of count 7 of the superseding indictment. The government's goal in seeking to dismiss the charges or parts of charges in question was to eliminate the need for two juries or two trials and to prevent possible error, in light of a ruling of the Eighth Circuit Court of Appeals on interlocutory appeals that certain evidence *is not* admissible as to the counts of Case No. CR 00–3034–MWB that involve the alleged murders of five witnesses, but *is* admissible as to charges that involve the alleged murders of the same witnesses in Case No. CR 01–3046–MWB. As a result of the partial dismissal of the first indictment, the charges in Case No. CR 00–3034–MWB consisted of one count of aiding and abetting the solicitation of the murders of witnesses Cutkomp and Cobeen, in violation of 18 U.S.C. §§ 373(a)(1) and 2, and one count of conspiracy to interfere with witnesses Cutkomp and Cobeen, in violation of 18 U.S.C. § 371, but the latter charge no longer related to the murders of the other five witnesses, Nicholson, the Duncans, and DeGeus.

On December 8, 2004, the government filed a Second Superseding Indictment in Case No. CR 01–3046–MWB, which essentially consolidated the remaining counts in the two separate cases into a single indictment. Thus, Counts 1 through 5 of the Second Superseding Indictment charge the "conspiracy murders" of Nicholson, the Duncans, and DeGeus; Counts 6 through 10 charge the "CCE murders" of Nicholson, the Duncans, and DeGeus; new Count 11 charges aiding and abetting the solicitation of Dean Donaldson and Anthony Altimus to murder Timothy Cutkomp;[2] and new Count 12 charges conspiracy to solicit the murder of Daniel Cobeen, Timothy Cutkomp, and Special Agent John Graham.[3] On December 14, 2004, the government moved to dismiss the superseding indictment in Case No. CR 00–3034–MWB, because all charges against Johnson were then consolidated into a single charging document in Case No. CR 01–3046–MWB. Johnson concurred in the dismissal of that indictment on December 15, 2004. Therefore, on December 15, 2004, the court dismissed the superseding indictment in Case No. CR 00–3034–MWB, and denied as moot all motions pending it that case, leaving Case No. CR 01–3046–MWB as the only case against Johnson.

### B. The Co–Defendant's Trial

In a companion case, Case No. CR 01–3047–MWB, the Grand Jury charged Dustin Lee Honken with seventeen charges that were essentially identical to the charges in the indictments against Johnson. As in Johnson's case, the government sought the death penalty on the five counts of "conspiracy murder" and the five counts of "CCE murder." In Honken's case, as in this one, the government moved for an "anonymous" jury, and in Honken's case, the court granted the motion. Therefore, jurors' names, addresses, and places of employment, and the names of spouses and their places of employment, were not disclosed to the parties, their

---

2. Thus, as compared to Count 6 of the superseding indictment in Case No. CR 00–3034–MWB, this count drops the portion of the charge alleging solicitation of Donaldson and Altimus to murder Daniel Cobeen.

3. This count also differs from Count 7 of the superseding indictment of Case No. CR 00–3034–MWB, in that it deletes the portions of that Count that charged conspiracy to solicit the murders of Nicholson, the Duncans, and DeGeus.

counsel, or the public, either before or after selection of the jury panel. However, each juror's community of residence and the "nature" of his or her employment, and the "nature" of his or her spouse's employment, were disclosed to the parties, their counsel, and the public.

Jury selection began in Honken's case on August 17, 2004, and continued over twelve days until a jury was empaneled on September 8, 2004. The "merits phase" of the trial began that day and continued, usually four days a week, until the issue of Honken's guilt or innocence was submitted to the jury on October 11, 2004. The jury returned a verdict on October 14, 2004, finding defendant Honken guilty of all seventeen charges. The "penalty phase" of Honken's trial commenced on October 18, 2004, and concluded on October 21, 2004, at which time the jury began its "penalty phase" deliberations. An issue of improper contacts with a juror arose during the "penalty phase" deliberations. Ultimately, on October 25, 2004, the court excused one juror and substituted an alternate juror. The jury was then instructed to begin its "penalty phase" deliberations anew. On October 27, 2004, the jury rendered its "penalty phase" verdict, finding that a sentence of life imprisonment should be imposed upon Honken for the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, but that a sentence of death should be imposed for the murders of Amber and Kandi Duncan. The jury contact issue and the verdicts, in both the "merits phase" and the "penalty phase," garnered considerable additional media coverage.

### C. The Pretrial Motions In Johnson's Case

Twelve motions are currently pending in the case[4] against Johnson: (1) the government's February 23, 2004, Motion In

Limine Regarding Alibi Defense (docket no. 187); (2) the government's May 25, 2004, Renewed Motion For Anonymous Jury And Request For Court Order (docket no. 197, which renews docket no. 188); (3) the government's November 3, 2004, Renewed Motion To Introduce Evidence Of Defendant's Attempted Suicide (docket no. 203); (4) defendant Johnson's November 4, 2004, Motion For Change Of Venue (docket no. 204), which Johnson supplemented, at the court's direction, on December 4, 2004 (docket no. 227); (5) the government's November 15, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Out Of Court Statements Made By Decedents Gregory Nicholson And Terry DeGeus (docket no. 207); (6) defendant Johnson's November 16, 2004, Motion For Factual Findings Re: Instructions To Elicit (docket no. 208); (7) defendant Johnson's November 16, 2004, Motion In Limine Re: Evidence Suppressed As To First Indictment (docket no. 209); (8) defendant Johnson's Motion To Suppress (docket no. 210), as amended November 17, 2004 (docket no. 211), which seeks to suppress statements made by Johnson to jailhouse informant Robert McNeese while Johnson was incarcerated in the Benton County Jail on the ground that the statements were obtained in violation of Johnson's Fifth Amendment right to counsel as guaranteed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (9) defendant Johnson's November 20, 2004, Application [For] Preparation Of Trial Transcript In *United States v. Honken* (docket no. 216); (10) the government's December 3, 2004, Motion In Limine To Bar Discussion Or Evidence Of Certain Aspects Of The Death Penalty (docket no. 224); (11) the government's December 3, 2004, Motion

---

4. "Mirror image" motions were pending in Case No. CR 00–3034–MWB. However, those motions were denied as moot in the

order dismissing the superseding indictment in that case.

In Limine Regarding Timothy Cutkomp's Instances Of Public Exposure (docket no. 225); and (12) the government's December 3, 2004, Rule 104(c) Motion For Admission Of A Replica Firearm (docket no. 226). Most of the motions were duly resisted.

By order dated November 17, 2004, the court set a hearing on December 20, 2004, for all motions filed on or before December 7, 2004. At the hearing, the government was represented by Assistant United States Attorney C.J. Williams in Cedar Rapids, Iowa, and Assistant Iowa Attorney General Thomas Henry Miller in Des Moines, Iowa. Defendant Angela Johnson was personally present at the hearing and was represented by Alfred E. Willett of Terpstra, Epping & Willett in Cedar Rapids, Iowa; Dean A. Stowers of Rosenberg, Stowers & Morse in Des Moines, Iowa; and Patrick J. Berrigan of Watson & Dameron, L.L.P., in Kansas City, Missouri. At the hearing, the parties agreed that no part of the hearing would be closed and that no part of this ruling would need to be sealed.

The court will address each of the pending motions in turn, although not necessarily in the order in which they were filed.

## II. LEGAL ANALYSIS

### A. The Government's Motions

#### 1. The motion to exclude alibi defense

The court will begin its analysis with the government's various motions. The first of these motions is the government's February 23, 2004, Motion In Limine Regarding Alibi Defense (docket no. 187). In that motion, the government moves the court for an order barring Johnson from presenting evidence supporting or argument alleging an alibi defense.

#### a. Arguments of the parties

In support of this motion, the government contends that Johnson has failed to comply with Rule 12.1 of the Federal Rules of Criminal Procedure, because she has failed to respond to the government's request for notice of alibi defense or the court's orders compelling such a response. The government points out that the court rejected Johnson's challenge to the sufficiency of the government's request for notice of alibi, that the court then gave Johnson until March 7, 2003, to provide a notice in response to the government's request, but that Johnson has never done so. At oral arguments, the government reiterated that the purpose of the disclosure rule is to avoid surprise and that its concern was that Johnson would produce at trial a witness who would testify that Johnson was with the witness on the dates identified by the government at such a time and place that Johnson could not have committed or participated in the crimes charged. The government conceded, however, that Johnson could present evidence as to her whereabouts in the Mason City area at various times during the periods identified in the government's request for notice of alibi defense.

The government also points out that Rule 12.1 provides that the court may exclude the testimony of any undisclosed alibi witness, if the defendant fails to comply with the rule. At the oral arguments, the government asserted that, in addition to excluding undisclosed witnesses, the court could exclude documentary evidence or testimony by the defendant herself that would support an alibi defense. The parties were given until December 24, 2004, to research the issue of the scope of appropriate remedies for failure to comply with Rule 12.1 and to file supplements to their briefs on this issue. On December 21, 2004, the government e-mailed the court

and opposing counsel that counsel's research suggested that barring a defendant from testifying as to an alibi would probably violate the defendant's Sixth Amendment rights and that Rule 12.1 does not require a defendant to disclose documents in support of an alibi defense. The government nevertheless suggested that, should Johnson testify as to an alibi, the government might be entitled to an instruction to the jury that Johnson had not previously disclosed such an alibi and/or a continuance to prepare to rebut such testimony, and that, if she attempted to rely on documents in support of such a defense, the court had the inherent power to sanction her for failure to comply with a discovery request for alibi documents. However, the government also suggested that the court should not consider such scenarios until and unless they arose at trial.

In an amended response to the government's motion in limine and in oral arguments, Johnson maintained her position that the alibi demand by the government was inadequate to trigger her obligation to respond. However, acknowledging that the court has rejected her position, Johnson also contends that the government has thoroughly investigated her whereabouts on the dates identified by the government. She also contends that the government's motion is overbroad, because evidence showing that she was at locations other than those identified by the government during the pertinent two-day periods in July and November 1993 should be admissible, because it does not constitute an "alibi defense," even if it may be "evidence supporting" such a defense. Finally, she contends that the government's motion is premature, because trial in this matter is still some months away.

### b. Analysis

**i. Rule 12.1.** Rule 12.1 of the Federal Rules of Criminal Procedure provides, in pertinent part, as follows:

**(a) Government's Request for Notice and Defendant's Response.**

**(1) Government's Request.** An attorney for the government may request in writing that the defendant notify an attorney for the government of any intended alibi defense. The request must state the time, date, and place of the alleged offense.

**(2) Defendant's Response.** Within 10 days after the request, or at some other time the court sets, the defendant must serve written notice on an attorney for the government of any intended alibi defense. The defendant's notice must state:

**(A)** each specific place where the defendant claims to have been at the time of the alleged offense; and

**(B)** the name, address, and telephone number of each alibi witness on whom the defendant intends to rely.

\* \* \* \* \* \*

**(e) Failure to Comply.** If a party fails to comply with this rule, the court may exclude the testimony of any undisclosed witness regarding the defendant's alibi. This rule does not limit the defendant's right to testify.

FED. R. CRIM. P. 12.1(a) & (e). Thus, the rule, *inter alia*, establishes a government-initiated process for determining whether the defendant will assert an alibi defense, identifies the information that the defendant must provide in response to the government's request for notice of an alibi defense, and provides sanctions for failure to comply with the disclosure requirements of the rule.

**ii. Johnson's non-compliance.** Johnson plainly has not complied with the requirements of the rule. The government provided the request for notice of an alibi defense required by Rule 12.1(a)(1), but Johnson did not respond as required by

Rule 12.1(a)(2). Instead, Johnson litigated the question of whether or not the government's request was adequate, which she was entitled to do, but she lost. She did not then take an interlocutory appeal of the question and she has presented no compelling reason for the court to revisit the question now. Moreover, under the circumstances presented here, upon denial of her challenge, Johnson was required to respond to the government's request by the deadline set by the court. FED. R. CRIM. P. 12.1(a)(2) (the defendant's response to the government's request is due within ten days or at such other time as the court sets). However, she did not file any timely response. Therefore, Johnson has not complied with the rule and will not now be heard to complain that either the government's original request or the government's motion to exclude alibi evidence based on Johnson's failure to respond was "premature."

Nor is Johnson excused from filing a response or from sanctions for failure to do so by her contention that the government has already thoroughly investigated her whereabouts during the periods identified in the government's request for notice of alibi defense. The disclosure requirements are imposed in the context of the government's investigation of a defendant's whereabouts and the parties' disclosure of witnesses. As the Advisory Committee explained,

> Rule 12.1 will serve a useful purpose even though rule 16 now requires disclosure of the names and addresses of government and defense witnesses. There are cases in which the identity of defense witnesses may be known, but it may come as a surprise to the government that they intend to testify as to an alibi and there may be no advance notice of the details of the claimed alibi. The result often is an unnecessary interruption and delay in the trial to enable the government to conduct an appropriate investigation. The objective of rule 12.1 is to prevent this by providing a mechanism which will enable the parties to have specific information in advance of trial to prepare to meet the issue of alibi during the trial.

FED. R. CRIM. P. 12.1, Advisory Committee Notes; *see also id.*, 1975 Enactment, Committee Action ("The major purpose of a notice-of-alibi rule is to prevent unfair surprise to the prosecution."); *accord United States v. Webster*, 769 F.2d 487, 490 (8th Cir.1985) ("[T]he purpose of the alibi notice requirement is to prevent surprise and undue delay."). Thus, the rule recognizes that, despite government investigation and the parties' disclosure of witnesses, specific disclosure of an alibi defense is necessary to avoid unfair surprise to the government.

Johnson was also required to disclose any contention that she was at a location other than the location identified by the government on the dates in question, not just the identity of witnesses who may testify in support of an alibi defense. In *United States v. Jones*, 255 F.3d 916 (8th Cir.2001), the court distinguished between "evidence" relating to an alibi defense and a "witness" relating to an alibi defense, albeit in the context of the defendant's assertion that the government had failed to comply with the reciprocal disclosure requirements of Rule 12.1(b) for rebuttal evidence, where the defendant had given notice of an alibi defense. *Jones*, 255 F.3d at 919; *see also* FED. R. CRIM. P. 12.1(b) (providing that, if the defendant provides notice of an alibi defense in response to a Rule 12.1(a) request, the government must disclose any "rebuttal witness" to the defendant's alibi defense). In *Jones*, the defendant asserted that the trial court had erred by permitting the government to use a document showing that the alibi witness had been in jail at the time that she said she was with the defendant, because the government had not disclosed the docu-

ment pursuant to Rule 12.1(b). The Eighth Circuit Court of Appeals, however, held that Rule 12.1(b) requires disclosure of witnesses, not evidence. *Jones*, 255 F.3d at 918. In contrast, Rule 12.1(a), requires the defendant to disclose, in response to a request from the government, not only "the name, address, and telephone number of each *alibi witness* on whom the defendant intends to rely," *see* FED. R. CRIM. P. 12.1(a)(2)(B) (emphasis added), but *also* "each specific place where the defendant claims to have been at the time of the alleged offense." FED. R. CRIM. P. 12.1(a)(2)(A). Thus, Johnson was required to disclose any contention that she was at any locations other than those identified by the government during the two-day periods in July and November 1993 identified in the government's request for notice of alibi defense, because any contention that she was somewhere else falls squarely within the disclosure requirements of Rule 12.1(a)(2)(A). She has not done so.

Finally, Johnson was obligated by subsection (c) of the rule to disclose any alibi witness discovered after the deadline for disclosures required by subsections (a) and (b). *See* FED. R. CRIM. P. 12.1(c) (imposing on both parties a continuing duty to disclose witnesses relevant to an alibi defense, if "(1) the disclosing party learns of the witness before or during trial; and (2) the witness should have been disclosed under Rule 12.1(a) or (b) if the disclosing party had known of the witness earlier"). Consequently, if Johnson has any knowledge of any alibi witnesses at this time—which seems doubtful, where she has never identified any such witnesses in any pleading or filing in these cases—she has not made a timely disclosure of those witnesses.

 *iii. The appropriate remedy.* Under the circumstances presented here, the real question is what evidence, if any, Johnson should be barred from presenting in support of any alibi defense as a result of her failure to comply with Rule 12.1 and the court's deadline for an alibi disclosure. *See* FED. R. CRIM. P. 12.1(e) ("the court *may* " impose sanctions for failure to comply with the rule) (emphasis added); *id.*, Advisory Committee Notes ("The use of the term 'may' [in subsection (e) ] is intended to make clear that the judge may allow the alibi witness to testify if, under the particular circumstances, there is cause shown for the failure to conform to the requirements of the rule"). The government seeks an order barring Johnson from presenting evidence supporting or argument alleging an alibi defense. Johnson, however, contends that she may still present evidence that she was at locations other than those identified by the government at various times during the two-day periods in July and November 1993 identified in the government in its request for notice of alibi defense, because such evidence does not constitute an "alibi defense," even if it may be "evidence supporting" such a defense.

The remedy that Rule 12.1(e) expressly provides for failure to comply with the disclosure requirements of the rule is "exclu[sion of] the testimony of any undisclosed *witness* regarding the defendant's alibi." FED. R. CRIM. P. 12.1(e) (emphasis added). Some time ago, however, in *United States v. Webster*, 769 F.2d 487 (8th Cir.1985), the Eighth Circuit Court of Appeals rejected the government's argument that it was inappropriate to give an alibi instruction to the jury, where the defendant had purportedly failed to disclose an alibi witness. *Webster*, 769 F.2d at 490. Although the court noted, first, that the defendant had in fact complied with the alibi notice requirement, the court also held that "[the defendant's] alleged failure to comply with the alibi notice requirement is not strictly relevant to refusal to give an alibi instruction." *Id.* Rather,

the court noted that the remedy provided in Rule 12.1 "is *exclusion* of the testimony of any undisclosed witness." *Id.* (emphasis in the original) (citing Rule 12.1(d), which contained the "remedies" provision at the time). Thus, even had the defendant failed to comply with the notice of alibi requirements, refusal to instruct on an alibi defense would not have been a proper remedy. *Id.* Just as an *instruction* on an alibi defense is not precluded by failure to comply with Rule 12.1, this court concludes that a defendant's *argument* concerning an alibi defense is not precluded by failure to comply with the rule, because the "remedies" provision of the rule, subsection (e), only authorizes exclusion of *testimony* of an undisclosed alibi witness. Furthermore, the rule expressly provides that the remedy of exclusion of alibi *witnesses* does not limit Johnson's right to testify. *See* FED. R. CRIM. P. 12.1(e) (Rule 12.1, including its "remedies" provision, "does not limit the defendant's right to testify"). This caveat would be superfluous if the rule were intended to prohibit a defendant from testifying in support of an alibi. Therefore, notwithstanding her failure to comply with Rule 12.1, Johnson may argue, on the basis of her own testimony, that she was not at the locations alleged by the government on the dates in question. Consequently, contrary to the government's request, the court will not exclude any and all argument alleging an alibi.

Nevertheless, the defendant cannot be allowed to sandbag the government concerning any known alibi witnesses in an attempt to "gain 'a tactical advantage that would minimize the effectiveness of cross-examination, and the ability of the government to present rebuttal evidence.'" *United States v. Henderson,* 241 F.3d 638, 650 (9th Cir.2000) (quoting the trial court), *cert. denied,* 532 U.S. 986, 121 S.Ct. 1634, 149 L.Ed.2d 494 (2001). Furthermore, the court finds that Johnson's conduct suggests willful noncompliance with the rule.

First, Johnson has steadfastly refused to disclose any alibi witnesses, despite the government's original request and the court-ordered deadline for her disclosure after her challenge to the sufficiency of the government's request failed. Second, she has continued to evade any obligation to disclose alibi witnesses by continuing to assert failed challenges to the government's request after the issue has been litigated, and by asserting new "straw man" arguments that she should not have to disclose any alibi witnesses, because the government's request is premature, and because the government has already investigated her whereabouts. *See* FED. R. CRIM. P. 12.1(c) (imposing on both parties a continuing duty to disclose witnesses relevant to an alibi defense, if "(1) the disclosing party learns of the witness before or during trial; and (2) the witness should have been disclosed under Rule 12.1(a) or (b) if the disclosing party had known of the witness earlier"). Johnson's failure to disclose such a witness can only be excused for "good cause," but there is no evidence of "good cause" in the record. *See* FED. R. CRIM. P. 12.1(d) (providing exceptions to the disclosure requirements of subsections (a), (b), and (c) for "good cause").

Therefore, the government's motion will be granted to the extent that Johnson will not now be permitted to present any testimony of any witness—other than herself—that she was *at locations outside the Mason City area or at any location such that she could not have committed the charged murders* at the times identified in the government's request for notice of alibi defense, unless she demonstrates that she did not learn of the witness or could not have learned of the witness through reasonable diligence prior to the time a disclosure is offered. She may also present her own testimony as to her whereabouts, any non-testimonial evidence of her whereabouts, and argument in support of an alibi

defense premised on such evidence. Finally, she may present evidence as to her whereabouts *in the Mason City area* at the times identified in the government's request for notice of .alibi defense. The court will consider, however, an appropriate instruction concerning Johnson's failure to make a timely disclosure of any alibi defense, should Johnson actually ·attempt to assert such a defense.

### 2. The motion for an anonymous jury

#### a. Arguments of the parties

The next motion by the government addressed by the court at the hearing on December 20, 2004, was the government's May 25, 2004, Renewed Motion For Anonymous Jury And Request For Court Order (docket no. 197), which renewed the government's original February 23, 2004, motion for an anonymous jury (docket no. 188). In its original motion, the government requested that the court empanel an anonymous jury; submit a proposed jury questionnaire to the jury; and obtain criminal histories on members of the jury venire, compare the criminal histories with the venire members' self-disclosures, and inform the parties of any criminal history not self-disclosed. The government asserted that Johnson posed sufficient danger to jurors and potential jurors that they should be anonymous, but that a "neutral" explanation for the jurors' anonymity would mitigate any adverse impact upon Johnson's right to a fair trial. In its renewed motion, the government pointed out that Johnson filed no timely resistance to its original motion. Therefore, the government contended that the court should grant its motion for an anonymous jury.

Although Johnson filed no timely resistance to the government's original motion; she resisted the government's renewed motion on May 28, 2004, but only in Case No. CR 00–3034–MWB. On December 16, 2004, Johnson filed a still more belated resistance in Case No. CR 01–3046–MWB, after the court provided the parties in this case, by e-mail on December 13, 2004, with a copy of its detailed ruling on the anonymous jury issue in Honken's case. In her resistances, Johnson contended that, whatever the basis for the court's decision to use an anonymous jury in Honken's case, the record in her case did not support such a measure.

Despite the court's conclusion that an "anonymous" jury was required in the companion case against Johnson's co-defendant, Dustin Honken, at a conference prior to the December 20, 2004, hearing in Johnson's case, and again during that hearing, the court indicated its intention to use instead an "innominate" jury in this case—that is, a jury whose members were identified by number in open court, but about whom the parties were provided all of the information required by 18 U.S.C. § 3432. The court indicated to the parties that· it considered such a measure appropriate in ·a case that has engendered considerable media attention to protect jurors from publicity and unwanted contacts by members of the public. The government then represented on the record that it was withdrawing its motion for an anonymous jury, on the understanding that the court would order an "innominate" jury. Johnson continued to resist use of an "innominate" jury, asserting that, even if the jurors were told that such a measure was to protect them from publicity and unwanted contacts by members of the public, some jurors might nevertheless draw an inference that the measure was to protect them from a dangerous defendant, which would compromise Johnson's right to a fair trial.

#### b. Analysis

■ Although the government has withdrawn its motion for an anonymous jury, the court must still consider Johnson's ob-

jections to identifying jurors and potential jurors by number during court proceedings. A jury with this low degree "anonymity" might be described as "innominate," rather than "anonymous," as only the jurors' names are kept confidential and only from the public. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 603 (10th ed.1995) (defining "innominate" as "having no name; unnamed"); *Cf. United States v. Carpa,* 271 F.3d 962, 964 n. 1 (11th Cir. 2001) (describing a jury as "innominate" rather than "anonymous," because "[t]he only facts not known to the parties were names, addresses, and exact places of work"), *cert. denied,* 537 U.S. 889, 123 S.Ct. 137, 154 L.Ed.2d 151 (2002). Notwithstanding Johnson's objections, the court finds that such a measure is appropriate in this case. In *United States v. Peoples,* 250 F.3d 630 (8th Cir.2001), the Eighth Circuit Court of Appeals observed that "[t]he district court has wide discretion ... to require the use of numbers for identification [of jurors] *in any case.*" *Peoples,* 250 F.3d at 635 (emphasis added). In light of the extensive publicity this case and the companion case against Honken have already received, and the extensive publicity that can reasonably be anticipated as Johnson's case goes to trial, the court finds that it is appropriate to require the use of numbers for identification of jurors in court in order to protect juror privacy from excessive media attention and from intrusion by other interested members of the public, and thereby also to limit the potential for jurors to be exposed to extra-judicial information.

■ The court acknowledges that even an "innominate" jury could have some impact upon the defendant's right to a fair trial. However, the Eighth Circuit Court of Appeals, like many other courts, has found that the negative impact of a truly "anonymous" jury upon the defendant's rights can be mitigated by an instruction to the jury providing a "neutral" explanation for their anonymity. *See, e.g., United States v. Darden,* 70 F.3d 1507, 1533 (8th Cir.1995) (finding "that the District Court took reasonable precautions to ensure that the empanelment of an anonymous jury would not result in undue prejudice against the defendants," where "[t]he court told the venire persons that they were being identified by numbers rather than their names so that members of the media would not ask them questions"), *cert. denied,* 517 U.S. 1149, 116 S.Ct. 1449, 134 L.Ed.2d 569 (1996). Here, the court finds that such a "neutral" explanation would also sufficiently mitigate any potential negative impact of using an "innominate" jury upon the defendant's rights. Furthermore, in this case, such an explanation would match the *actual* reason for using numbers rather than names, so that there would be no dissembling in the explanation given to the jury nor any reason for jurors to infer any other reason for such a measure.

Therefore, while not "anonymous," the prospective jurors and the jurors ultimately selected to serve in this case will be identified in court only by numbers. Johnson's counsel, however, will be given the full disclosures ordinarily required by 18 U.S.C. § 3432. *See* 18 U.S.C. § 3432 (except in circumstances the court finds are not present here, "[a] person charged with [a] capital offense *shall* at least three entire days before commencement of trial be furnished with ... a list of the veniremen. ...") (emphasis added).

### 3. *The motion to admit evidence of defendant's attempted suicide*

The next motion by the government now before the court is the government's November 3, 2004, Renewed Motion To Introduce Evidence Of Defendant's Attempted Suicide (docket no. 203), which renews an original motion, filed April 19, 2002 (docket

no. 42). The motion involves evidence that Johnson attempted to commit suicide immediately after it became public knowledge that law enforcement authorities had recovered the alleged murder victims' remains.

### a. Arguments of the parties

In support of its original motion, which the government contended was pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the government contended that it should be allowed to introduce evidence of Johnson's attempted suicide, because the attempted suicide is circumstantial evidence of Johnson's guilt. In its renewed motion to admit the evidence, which the government now asserts is pursuant to either Rule 12(d) of the Federal Rules of Criminal Procedure or Rule 104 of the Federal Rules of Evidence, the government points out that Johnson's resistance to the original motion, which Johnson filed on April 25, 2002, asserted only that the evidence was somehow derivative of evidence obtained from a jailhouse informant.[5] The government points out that it filed a reply on April 30, 2004, requesting that the defendant respond to the merits of the motion, but she did not then do so.

On December 16, 2004, Johnson filed a very belated response to the government's renewed motion. In that response, Johnson acknowledged that, under applicable case law, the evidence of a suicide attempt is relevant to prove consciousness of guilt, but that it would be improper for the government to offer or argue for the admission of such evidence for any other inference than that presented in the government's motion in limine. Moreover, despite contrary case law, which she also acknowledges, Johnson asserts that the danger of unfair prejudice in this case

substantially outweighs the probative value of this evidence, such that it should be excluded, although she makes no attempt to articulate what the unfair prejudice would be. At oral arguments, Johnson clarified that an example of prejudicial use of the evidence would be the government arguing in the course of a "penalty phase" that the jury "should finish what Johnson started."

### b. Analysis

The court will not simply rely on Johnson's failure to file a timely resistance to the government's renewed motion, although it could properly do so. See. N.D. IA. L.R. 7.1(f) ("If no timely resistance to a motion is filed, the motion may be granted without prior notice from the court."). Rather, the court will explore, albeit briefly, the standards applicable to the admissibility of a defendant's suicide attempt.

The government is correct that some courts have recognized that a suicide or attempted suicide is admissible as evidence of "consciousness of guilt," tantamount to a confession. See, e.g., Tug Raven v. Trexler, 419 F.2d 536, 543 (4th Cir.1969) (evidence of the suicide of the person in charge of gasoline-discharging operations on a barge that caught fire, killing a member of the crew of a tug boat moored next to the barge, eight days after that person testified in the Coast Guard investigation of the fire was admitted as possibly showing consciousness of guilt, on the ground that "suicide is a form of flight"), cert. denied, 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 271 (1970); see also State · v. Mitchell, 450 N.W.2d 828, 831–32 (Iowa 1990) (noting that "[c]ourts in Iowa and elsewhere have found evidence of suicide attempts relevant to show the defendant's consciousness of guilt") (citing cases).

---

**5.** Johnson also contended that the motion was not properly made pursuant to Rule 12(d), but might ·properly be made pursuant to Rule 104.

Some courts, however, have recognized that such evidence is at best equivocal, in the absence of evidence of the reasons for the suicide or attempted suicide, because there could be numerous reasons for a suicide attempt other than consciousness of guilt on a charged offense. *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir.1985) (giving as an example of equivocal, but nevertheless admissible evidence, evidence of a suicide to show consciousness of guilt, citing *Tug Raven*, 419 F.2d at 543); *United States v. Goodman*, 605 F.2d 870, 883 (5th Cir.1979) (evidence of a co-defendant's suicide was not admissible on the ground that it was "tantamount to a confession," in the absence of any evidence of why the co-defendant committed such an act). In Johnson's case, although the government is correct that a jury could infer a "consciousness of guilt" *for the charged murders* from Johnson's suicide attempt, a jury could reasonably infer that the attempt indicates consciousness of something else, such as consciousness of Honken's guilt, consciousness that she had learned about or helped conceal the bodies only after the murders were committed, consciousness that she had been betrayed by a supposed fellow inmate, or consciousness that she had betrayed her former boyfriend's secret. It could also demonstrate lack of faith in the judicial system to recognize her lack of involvement in crimes committed by another or her fear that Honken would retaliate against her for revealing his secret.

■ Although the evidence of Johnson's suicide attempt is, at best, equivocal, the court nevertheless acknowledges that it is at least marginally probative of her involvement in the murders, because it may make it more probable that she knew about and participated in the crimes, in that it suggests Johnson's "consciousness of guilt" for the murders. *See* FED. R. EVID. 401 (evidence is "relevant" if it has "any tendency to make the existence of

any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Where Johnson has made only a conclusory allegation of unfair prejudice, but has made no effort to demonstrate how the evidence of her suicide attempt is unfairly prejudicial or potentially confusing, such that the prejudice arising from admission of the evidence would outweigh its marginal probative value, *see* FED. R. EVID. 403 (allowing exclusion of evidence where its probative value is outweighed, *inter alia*, by the danger of unfair prejudice or confusion of the issues), the court will not speculate about possible unfairly prejudicial inferences that might arise from the evidence.

■ On the other hand, Johnson has identified one potentially prejudicial argument that she contends the government should be precluded from making on the basis of the evidence of Johnson's attempted suicide, an argument that the jury should "finish what Johnson started." The government stated its doubts that such an argument was improper or that Rule 403 could be used to bar *prejudicial argument* as well as *prejudicial evidence*.

■ The court finds that it does clearly have the authority to act when a prejudicial argument is made. *See, e.g., Myres v. United States*, 174 F.2d 329, 338–39 (8th Cir.1949) (holding that a district court properly sustained an objection to and instructed the jury to disregard improper statements, noting that "[t]he prompt action of the District Court prevented the improper argument from ripening into prejudicial error"); *accord Koufakis v. Carvel*, 425 F.2d 892, 901 (2d Cir.1970) ("It seems to us that the trial judge should not guess about the jurors' reactions to an obviously improper argument. It is his responsibility to prevent counsel from continually making improper arguments and

using slanderous and baseless epithets. The trial judge should have categorically ordered [the offending attorney] to stop making such remarks and given the strongest possible cautionary instruction."). It follows, *a fortiori*, that when an objection is raised to a potentially prejudicial argument, the court may act to bar a party from making such an argument to the jury in the first place. Furthermore, the court finds no authority for the proposition that a defendant's attempted suicide is an aggravating factor that may properly be considered by a jury to weigh in favor of imposing the death penalty pursuant to 21 U.S.C. § 848. Therefore, the court will not permit the government to argue, in the "merits phase" or the "penalty phase," if any, on the basis of evidence that Johnson attempted to commit suicide, that the jury should "finish what Johnson started." Furthermore, the court will limit the government's arguments about the inferences to be drawn from Johnson's attempted suicide to the inferences that the government has asserted in its motion will warrant admissibility of that evidence.

Thus, in light of the court's conclusion that the evidence of Johnson's suicide attempt has some probative value to the issue of Johnson's involvement or participation in the murders at issue in this case, in that it suggests a "consciousness of guilt" for those murders, and the lack of any showing of a countervailing ground for exclusion of the evidence, the government's motion to admit evidence of Johnson's suicide attempt for the purpose of showing her "consciousness of guilt" for the murders will be granted. The government may not, however, argue for any *other inference to be drawn from that* evidence without prior court approval, and is expressly precluded from arguing in the "merits phase" or the "penalty phase," if any, on the basis of this evidence, that the jury should "finish what Johnson started."

### 4. The motion to admit statements by decedents

The next motion by the government now pending before the court is the government's November 15, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Out Of Court Statements Made By Decedents Gregory Nicholson And Terry DeGeus (docket no. 207). As in Honken's case, the government explains that, prior to his death, Terry DeGeus made several statements to others about the nature and extent of the drug-trafficking conspiracy in which he was involved with Honken and Johnson; where he was going the evening that he disappeared, including specific statements that he was meeting Angela Johnson; and his concerns about being indicted by or called as a witness before a federal grand jury. The government also explains that Gregory Nicholson made various statements to law enforcement officers and testified before a grand jury about his relationship with Honken and others, including Angela Johnson, and their drug-trafficking activities.

### a. The statements in question

*i. Statements by DeGeus.* More specifically, the government contends that there will be evidence of the following statements by Terry DeGeus: (1) that DeGeus told Kristin Thompson that he was to pick up methamphetamine from Honken on March 17, 1993, the day that Honken was first arrested on drug charges, that the methamphetamine and some powder for "cutting" the methamphetamine was coming from out of state, and that Angela Johnson owed him $2,400 for methamphetamine; (2) that about a week before his disappearance, DeGeus asked his mother, Joanne DeGeus, if a subpoena had arrived for him, and that on November 5, 1993, he delivered his daughter, Ashley, to his mother's home and told both his mother and his daughter that he was going to

meet Angela Johnson; (3) that on November 5, 1993, DeGeus told his daughter, Ashley, that he was going to Angela Johnson's house because she wanted to talk to him, that he was planning to pick up some things from Johnson, and that he would return by 12:30 a.m.; (4) that early in the evening of November 5, 1993, at DeGeus's home, DeGeus told a friend, Aaron Ryerson, that he was going to see Angela Johnson; and (5) that on November 5, 1993, at approximately 7:00 p.m., when DeGeus ran into a friend, Rhonda Hanson, at a grocery store in Britt, Iowa, DeGeus told Hanson that he was going to Mason City to see Angela Johnson.

***ii. Statements by Nicholson.*** The government also explains that, prior to his death, Gregory Nicholson gave statements to law enforcement officers and testified before a grand jury describing his drug-trafficking relationship with Honken and others, including Angela Johnson. More specifically, the government contends that there will be evidence that on March 17, 1993, while law enforcement officers were executing a search warrant for Nicholson's home, Nicholson was questioned by Investigator Frank Stearns of the Mason City Police Department and that during that questioning, Nicholson made the following statements: (1) that some methamphetamine was hidden in his house and where it was; (2) that he got the methamphetamine from Honken; (3) that Honken had a "meth lab" in Arizona; (4) that Honken brought up shipments of methamphetamine to Iowa every couple weeks for approximately a year; (5) that Nicholson owed Honken money for the last shipment of methamphetamine; (6) that Honken dropped off methamphetamine to another person unknown to Nicholson in Mason City; (7) that Honken charged Nicholson $1,200 an ounce for pure methamphet-

amine, but that Nicholson resold it for $1,500 an ounce; and (8) that Honken was coming to Mason City that weekend and that Nicholson was willing to cooperate with law enforcement officers. Nicholson subsequently assisted law enforcement officers with a "controlled buy" of methamphetamine from Honken on March 21, 1993, at which time Honken was arrested. On April 20, 1993, DEA Special Agent David Mizell interviewed Nicholson, at which time Nicholson made statements about his involvement with Honken and about Honken's drug manufacturing and distribution enterprise. Later that same day, Nicholson appeared before a federal grand jury in Cedar Rapids, Iowa, at which time he provided sworn testimony about his involvement with, and knowledge of, Honken's drug manufacturing and trafficking enterprise. However, the government did not identify any statements by Nicholson specifically relating to Angela Johnson.

***b. Admissibility of DeGeus's statements***

***i. Arguments of the parties.*** The government argues that neither the Constitution, federal law, the Federal Rules of Evidence, nor Supreme Court rulings bar the admission of the evidence of DeGeus's statements. Contrary to its original arguments in Honken, the government concedes here that DeGeus's statements are hearsay. The government argues that DeGeus's statements are nevertheless admissible, because they fall within several exceptions, including "present sense impression" (Rule 803(1)), "then existing mental state" (Rule 803(3)), and "forfeiture by wrongdoing" (Rule 804(b)(6)), the last exception premised on the government's contention that DeGeus is unavailable to testify because Johnson killed him.[6] The

---

**6.** The "forfeiture by wrongdoing" exception, as formulated in Rule 804(b)(6), applies to "[a]

statement offered against a party that has

government also contends that admission of the statements would not violate Johnson's confrontation rights under the standards set forth in either *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), or *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As to admissibility under *Roberts,* the government contends that the statements are reliable, under the circumstances, as merely informational and off-the-cuff, and that DeGeus is plainly unavailable, and that the hearsay exceptions upon which it relies are "firmly rooted." As to admissibility under *Crawford,* the government contends that the statements were not "testimonial," even if they were "hearsay," so that *Crawford* does not apply. The government also contends that the hearsay exception for "forfeiture by wrongdoing" trumps or excludes the statements from the requirements set forth in *Crawford.*

Johnson's resistance to admission of DeGeus's statements includes arguments both similar to and different from those raised in Honken's resistance to admission of the same evidence. Taking the similar arguments first, Johnson resists admission of DeGeus's statements under the hearsay exceptions cited by the government. According to Johnson, DeGeus's statements were not "present sense impressions," because none were made while, or immediately after, DeGeus perceived an event or condition, but refer to future events. She also contends that it is unclear how DeGeus's comments to his mother about a subpoena could fit within this exception. She contends that the statements are not statements of DeGeus's "then existing mental state," because they are not sufficiently reliable or relevant. As to admissibility of the statements under the "forfeiture by wrongdoing" exception, Johnson

contends that the statements were not offered "against" her, but "against" Honken, where it was Honken, not Johnson, who had been indicted at the time. She also contends that she did not engage or acquiesce in the wrongdoing that caused DeGeus to be unavailable, so that it is improper to admit such statements until her wrongdoing in procuring DeGeus's absence has been proved. Furthermore, she contends that the wrongdoing that permits admission of the statements must be unrelated to the conduct for which she is on trial, or there would be a "murder victim's" hearsay exception. She also argues that she did not intend to cause DeGeus's unavailability as a witness against her, because DeGeus was not going to be a witness against her, but against Honken, at the time that he was killed. Johnson also asserts that DeGeus's statements are not admissible under Rule 403, because they are highly prejudicial and only marginally relevant.

Like Honken, Johnson contends that admission of DeGues's statements is barred by the confrontation clause of the Sixth Amendment to the Constitution, although she does not assert precisely the same arguments in support of this contention. Johnson contends that admission of DeGeus's statements violates the confrontation clause, because the statements do not fit within a "firmly rooted" hearsay exception, nor do they bear "particularized guarantees of trustworthiness." In her most expansive argument, Johnson argues that the "forfeiture by wrongdoing" exception does not extinguish her rights under the confrontation clause. She contends that the right to confrontation trumps the "forfeiture by wrongdoing" exception, because it is a constitutional right, and she made no knowing and voluntary waiver of that

---

engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavail-

ability of the declarant as a witness." Fed. R. Evid 804(b)(6).

right. She also contends that the "forfeiture by wrongdoing exception" is not a "traditionally recognized" hearsay exception that would overcome her right to confrontation, where the government is attempting to expand that exception beyond the scope given to the rule under the common law. She reads pertinent cases to hold that only prior sworn testimony in the defendant's presence was admissible in a later proceeding under the common-law "forfeiture by wrongdoing" exception, but that the statements at issue here do not fit that requirement. She reiterated this contention as her key point during oral arguments. She also contends that the "forfeiture by wrongdoing" exception does not apply to DeGeus's statements, because the exception only applies to the admission of statements that qualify as "testimonial hearsay" made in a context in which the defendant had waived a right to confrontation.

Turning to Johnson's arguments that are entirely different from Honken's on the issue of admissibility of DeGeus's statements, Johnson contends, first, that the *ex post facto* clause of the Constitution bars the admission of the statements in question pursuant to Rule 804(b)(6) of the Federal Rules of Evidence. This is so, she contends, because the "forfeiture by wrongdoing" exception in Rule 804(b)(6) was only added to Rule 804 by amendment in 1997, several years after the murders at issue here allegedly took place. She contends that the amendment to Rule 804 was a substantive change in the law, because it altered the legal rules of evidence, making it easier to convict a defendant, so that the *ex post facto* clause applies. In other words, Johnson contends that DeGeus's statements would not have been admissible pursuant to this exception prior to 1997, so that allowing such statements now would make it easier for the government to overcome the presumption of innocence, which would violate the *ex post facto* clause.

Johnson also contends that admitting DeGeus's statements would violate the due process clause of the Constitution. Johnson points out that, while changes in law by legislation implicate the *ex post facto* clause, changes by judicial interpretation implicate the due process clause. She points out, further, that the Supreme Court recently refined the due process analysis in *Rogers v. Tennessee*, 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), to one of "fair warning" of an alteration in the law by judicial interpretation. Here, she contends that the "fair warning" standard bars admission of DeGeus's statements, because not every jurisdiction had recognized the "forfeiture by wrongdoing" hearsay exception as a matter of common law, nor was the standard of proof for such an exception uniform.

At oral arguments, the government rejected Johnson's contention that the confrontation clause only permits statements of a witness made unavailable by the defendant's wrongdoing if the defendant had previously had the opportunity to confront the witness in adversary proceedings. The government argued, instead, that the confrontation clause exception was premised on the equitable principle that the defendant should not profit from making a witness unavailable. The government concedes, however, that the statements of a witness made unavailable by the defendant should only be admissible over confrontation clause requirements if the statements were made *against the defendant*. Here, the government contends that all of DeGeus's statements were made *against* Johnson, where she was, and knew that she was, subject to investigation of her drug activities in conjunction with Honken.

***ii. Analysis.*** The court finds that the government was wise not to reassert here its initial contention in Honken's case that DeGeus's statements at issue in its motion

are not hearsay. Plainly, each such statement is an out-of-court statement of the declarant that could be, and likely would be, taken by the jury as offered for its truth. *See* FED. R. EVID. 801 (defining hearsay). Hearsay, of course, is not admissible in the absence of an applicable exception. *See* FED. R. EVID. 802 ("Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.").

The court finds that the government cannot rely successfully on all of the exceptions it asserts. As in Honken's case, the court concludes that the "present sense impression" exception is an uncomfortable fit, because it is not clear what "event" DeGeus was purportedly "perceiving" when he made statements that he was expecting a subpoena or that he was going to meet Johnson. *See* FED. R. EVID. 803(1) (the exception applies to a statement describing or explaining an event or condition while perceiving it); *United States v. Manfre*, 368 F.3d 832, 840 (8th Cir.2004) (the 803(1) exception is limited to statements while the declarant perceives an event or immediately thereafter). Also, it is unclear what the temporal relationship was between perception of any such event and the statements in question, such that it is difficult to assess whether the statements have sufficient contemporaneity to fall within the exception. *Manfre*, 368 F.3d at 840 (the exception is justified by the belief that contemporaneity of the event and the statement minimize unreliability from defective recollection or conscious fabrication); *United States v. Beck*, 122 F.3d 676, 682 (8th Cir.1997) (this exception requires "contemporaneity"). Thus, this exception does not permit admission of the statements in question.

■■ The "state of mind" exception, on the other hand, is a better fit. The "state of mind" exception applies to "[a] state-

ment of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." FED. R. EVID. 803(3). Numerous courts have recognized that this hearsay exception applies to statements of future intention, such as De-Geus's statement of his future intention to meet Johnson. *See, e.g., Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706 (1892) (holding that statements of a declarant's future intent are admissible to show that the declarant acted in conformity with his intention); *United States v. Bishop*, 291 F.3d 1100, 1110 (9th Cir.2002) (same), *cert. denied*, 537 U.S. 1176, 123 S.Ct. 1002, 154 L.Ed.2d 920 (2003); *United States v. Best*, 219 F.3d 192, 198 (2d Cir.2000) (rejecting the defendant's argument that there had to be independent evidence corroborating that the event actually took place, and holding that, "[i]f relevant, such a statement [of future intention] may be introduced to prove that the declarant thereafter acted in accordance with the stated intent), *cert. denied*, 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001); *see also Horton v. Allen*, 370 F.3d 75, 84 (1st Cir.2004) (holding that, under Massachusetts law, the state-of-mind exception permits the admission of statements that demonstrate the declarant's intent to perform some future act), *petition for cert. filed*, (Oct. 29, 2004) (No. 04–7278); *Kansas State Bank in Holton v. Citizens Bank of Windsor*, 737 F.2d 1490, 1497 (8th Cir.1984) (noting that Missouri's version of Rule 803(3) applies to statements of future intention)." Contrary to Johnson's contention, the court finds that the statements do have sufficient indicia of reliability to be admissible under this ex-

ception, because, *inter alia,* they were merely informational and off-the-cuff, and that DeGeus is plainly unavailable. Furthermore, Johnson has not explained in what way these statements are so "highly prejudicial" that they should be excluded pursuant to Rule 403, and the court sees no such prejudice. Thus, as in Honken's case, absent some constitutional bar, DeGeus's statements of his future intention to meet Johnson on the night he disappeared are plainly admissible in Johnson's case pursuant to Rule 803(3) to show that DeGeus acted in conformity with that intention.

■ The court finds no confrontation clause bar to admission of these statements under the "state of mind" exception. Johnson does not contend that DeGeus's statements are "testimonial"; therefore, the admissibility of such "non-testimonial" hearsay continues to be governed by *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *See Crawford v. Washington,* 541 U.S. 36, ——, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). Recently, in *Horton v. Allen,* 370 F.3d 75 (1st Cir.2004), *petition for cert. filed,* (Oct. 29, 2004) (No. 04–7278), the First Circuit Court of Appeals considered the confrontation clause limitations on admissibility of hearsay statements falling within the "state of mind" exception." *See Horton,* 370 F.3d at 84. The court in *Horton* found that the "state of mind" exception, even for statements of future intention, is "a firmly rooted hearsay exception," so that admission of such statements, where they are sufficiently reliable, "comports with *Roberts.*" *Id.* This court agrees and, therefore, holds that DeGeus's statements that are otherwise admissible under the "state of mind" exception are not barred from admission by the confrontation clause.

Reserving for later discussion Johnson's constitutional arguments against admissibility of the statements under the "forfei-

ture by wrongdoing" exception, the court finds, first, that DeGeus's statements could fall within such an exception. This exception applies to "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." FED. R. EVID. 804(b)(6). In *United States v. Emery,* 186 F.3d 921 (8th Cir.1999), *cert. denied,* 528 U.S. 1130, 120 S.Ct. 968, 145 L.Ed.2d 839 (2000), the Eighth Circuit Court of Appeals explained that "[t]he rule contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence. Instead, it establishes the general proposition that a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness." *Emery,* 186 F.3d at 926. Here, there is sufficient evidentiary basis for the allegations in the indictments that Johnson caused the unavailability of these witnesses, for example, in the evidence adduced at the hearing on the motion to suppress evidence obtained by McNeese, to warrant at least conditional admission of the decedents' statements pursuant to this exception.

■ Furthermore, Johnson's other contentions that this exception is inapplicable are unpersuasive. First, the *Emery* decision defeats Johnson's contention that the exception cannot apply unless the "wrongdoing" upon which the exception is based is different from the "wrongdoing" charged in the case, or there would be a "murder victim's" exception. In *Emery,* the court held that the exception *is* applicable to a missing witness's statements even in a trial for murdering that witness, not just in a trial for the underlying crimes about which the defendant allegedly feared that the missing witness would testify. *Id.* (involving a charge of killing a federal informant in violation of 18 U.S.C.

§ 1512(a)(1)(C)). Second, Johnson's contention that the statements were not offered "against" her, but against Honken, is also unpersuasive, because DeGeus's statements implicate her in both Honken's drug trafficking and DeGeus's disappearance. Likewise, the court is not persuaded by Johnson's contention that she did not engage or acquiesce in the wrongdoing, so that the evidence is not admissible until her wrongdoing is proved, because *Emery* sets out a procedure, discussed in the margin below, that is designed for precisely the purpose of establishing that a defendant's wrongdoing justifies application of the rule. *See Emery,* 186 F.3d at 926–27 (setting out a procedure for conditional admission of evidence pursuant to the "forfeiture by wrongdoing" exception and ultimate determination of the admissibility of such evidence).[7] Johnson also argues that she did not intend to cause DeGeus's unavailability as a witness against her, because DeGeus was not going to be a witness against her, but against Honken, at the time he was killed. This argument is unconvincing, because common sense shows that it is not the indictment of a defendant that makes someone a potential witness against that defendant, but the witness's knowledge of the defendant's illegal conduct; DeGeus certainly had such knowledge about Johnson. Finally, Johnson asserts that DeGeus's statements are not admissible under Rule 403, because they are "highly prejudicial" and only marginally relevant. However, she has not identified any *unfair* prejudice, or even any lack of probative value, that would bar admission of the statements pursuant to

---

7. In *Emery,* the court explained the procedure for admitting evidence under this exception, as follows:

> Mr. Emery also disputes the procedure that the trial court used to admit this hearsay evidence. He contends that the trial court should have held a preliminary hearing outside the presence of the jury, at which the prosecution would have had to prove by clear and convincing evidence that Mr. Emery procured Ms. Elkins's unavailability. The trial court, instead, admitted the evidence at trial in the presence of the jury contingent upon proof of the underlying murder by a preponderance of the evidence. In doing so, the trial court followed cases dealing with the hearsay statements of co-conspirators: In those cases, evidence is admitted conditionally subject to proof by a preponderance of the evidence that the defendant and the declarant were co-conspirators. *See United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir.1978).
>
> We agree with the trial court that a procedure adapted from the co-conspirator cases was appropriate in the present context. *See [United States v.] White,* 116 F.3d [903,] 911–12 [ (D.C.Cir.) (*per curiam* ), *cert. denied,* 522 U:S. 960, 118 S.Ct. 391, 139 L.Ed.2d 306 (1997) ]. In so ruling, we are motivated by the functional similarity of the questions involved and by the fact that the repetition necessarily inherent with a preliminary hearing would amount to a significant waste of judicial resources. *See id.* at 914–16. The trial court did not therefore err in denying Mr. Emery a preliminary hearing.
>
> The co-conspirator cases also provide guidance with respect to the issue of the relevant standard of proof. Although one federal appellate court has compared the situation in cases like the present one to the admissibility of in-court identifications that follow tainted out-of-court identifications, and has required proof of predicate facts by clear and convincing evidence, *see United States v. Thevis,* 665 F.2d 616, 629–30 (5th Cir.1982), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982), 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370 (1982), 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), we again follow the model of co-conspirator cases, and thus require proof by a preponderance of the evidence. *See Bell,* 573 F.2d at 1044. In so deciding, we align ourselves with the majority of circuits that have considered this question. *See, e.g., White,* 116 F.3d at 912, and *[United States v.] Houlihan,* 92 F.3d [1271,] 1280 [ (1st Cir.1996), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997) ].

*Emery,* 186 F.3d at 926–27.

Rule 403. Thus, as in Honken's case, all of the statements by DeGeus identified by the government will be conditionally admitted under the "forfeiture by wrongdoing" hearsay exception of Rule 804(b)(6) and the procedure outlined in *Emery,* unless there is some confrontation clause or other constitutional bar to admission of the evidence.

■ Contrary to Johnson's contentions, the court finds that admission of DeGeus's statements pursuant to the "forfeiture by wrongdoing" exception of Rule 804(b)(6) also comports with confrontation clause requirements. Before *Crawford* was handed down, the Eighth Circuit Court of Appeals observed in *Emery* that "forfeiture by wrongdoing" not only forfeits any hearsay objection, but forfeits the right of confrontation. *Emery,* 186 F.3d at 926. Specifically, the court noted "that it is well established that a defendant's misconduct may work a forfeiture of his or her constitutional right of confrontation, *see Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), and that the right of confrontation is forfeited with respect to any witness or potential witness whose absence a defendant wrongfully procures." *Id.* (citing *United States v. Carlson,* 547 F.2d 1346, 1359 (8th Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *United States v. White,* 116 F.3d 903, 911 (D.C.Cir.1997) *(per curiam ), cert. denied,* 522 U.S. 960, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997), and *United States v. Houlihan,* 92 F.3d 1271, 1279–80 (1st Cir.1996), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997)). Subsequently, in *Crawford,* the Supreme Court reaffirmed that "the rule of forfeiture by wrongdoing ... extinguishes confrontation claims on essentially equitable grounds." *Crawford,* 541 U.S. at ——, 124 S.Ct. at 1370. Thus, Johnson's contention that the "forfeiture by wrongdoing" exception cannot "trump" the confrontation clause is plainly contrary to *Crawford.* Moreover, as the government contends, Johnson's contention that *Crawford* only recognized such an exception where the defendant had had a prior opportunity to confront the now missing witness is rebutted by the Supreme Court's reliance in *Crawford* on no such factual circumstance, but upon "equitable grounds." *Id.* Therefore, the confrontation clause stands as no bar to the admission of any of DeGeus's statements falling within the "forfeiture by wrongdoing" hearsay exception in Rule 804(b)(6), just as it stands as no bar to admission of such statements pursuant to the "state of mind" hearsay exception in Rule 803(3).

■ Johnson, however, contends that reliance on the "forfeiture by wrongdoing" exception based on Rule 804(b)(6) violates the *ex post facto* clause of the Constitution, and that reliance on the common-law doctrine of "forfeiture by wrongdoing" violates the due process clause. The court will consider these contentions in turn.

The Supreme Court recently reiterated that "[t]he proscription against *ex post facto* laws 'necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing.'" *Carmell v. Texas,* 529 U.S. 513, 521, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (quoting *Calder v. Bull,* 3 U.S. 386, 3 Dall. 386, 390, 1 L.Ed. 648 (1798) (Chase, J.)). The category of *ex post facto* laws at issue here, as in *Carmell,* is the "fourth category" consisting of "'law[s] that alter[ ] the *legal* rules of *evidence,* and receive[ ] less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender.'*" *Id.* at 522, 120 S.Ct. 1620 (again quoting *Calder,* 3 U.S. 386, 3 Dall. at 390, 1 L.Ed. 648, with original emphasis in *Calder ).* At issue in *Carmell* was a Texas statute that had been amended to authorize conviction of certain sexual offenses on the victim's

testimony alone, where the previous statute had required the victim's testimony plus other corroborating evidence to convict the offender. *Id.* at 516, 120 S.Ct. 1620. The Court explained its conclusion that application of the amended statute to a defendant charged for a crime that occurred prior to the amendment would violate the *ex post facto* law, as follows:

> [The amended statute] is unquestionably a law "that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." Under the law in effect at the time the acts were committed, the prosecution's case was legally insufficient and petitioner was entitled to a judgment of acquittal, unless the State could produce both the victim's testimony and corroborative evidence. The amended law, however, changed the quantum of evidence necessary to sustain a conviction; under the new law, petitioner could be (and was) convicted on the victim's testimony alone, without any corroborating evidence. Under any commonsense understanding of *Calder's* fourth category, [the amended statute] plainly fits. Requiring only the victim's testimony to convict, rather than the victim's testimony plus other corroborating evidence is surely "less testimony required to convict" in any straightforward sense of those words.

*Carmell,* 529 U.S. at 530, 120 S.Ct. 1620.

Rule 804(b)(6), however, is not such a law, even though subdivision (b)(6) was not added to Rule 804 until 1997, four years after Johnson allegedly participated in the murders of Nicholson, the Duncans, and DeGeus. *See* FED. R. EVID. 804, Advisory Committee Notes, 1997 Amendments (adding subdivision (b)(6)). Rule 804(b)(6) is not a law that " 'receives … different … testimony … than the law required at the time of the commission of the offence, in

order to convict the offender,' " *see id.* (quoting *Calder,* 3 U.S. 386, 3 Dall. at 390, 1 L.Ed. 648), because it says nothing about what the law *requires* to convict anyone of any offense, does not change the elements of the offense, and does not lessen the amount or measure of proof required for a conviction. Rather, it simply changes what evidence is competent in a criminal prosecution. *Compare id.* (noting that the Texas statute authorized the conviction of the defendant on the testimony of the victim alone, when testimony of the victim plus corroboration was previously required to convict the defendant, so that application of the amended statute violated the *ex post facto* clause); *with Hopt v. Utah,* 110 U.S. 574, 589, 4 S.Ct. 202, 28 L.Ed. 262 (1884) (explaining that "[s]tatutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not … alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed"); *Thompson v. Missouri,* 171 U.S. 380, 386–87, 18 S.Ct. 922, 43 L.Ed. 204 (1898) (a change in evidentiary rules making certain incriminating evidence admissible at a defendant's retrial did not violate the *ex post facto* clause); *Frazier v. Huffman,* 343 F.3d 780, 801 (6th Cir.2003) (holding that application of Rule 410 of the Ohio Rules of Evidence, which expanded the range of admissible testimony regarding statements made during plea negotiations, did not offend the *ex post facto* clause, because the new rule "did not alter the quantum of evidence necessary to convict [the petitioner], [but only] expanded the range of admissible testimony," citing *Hopt* ), *cert. denied,* —— U.S. ——, 124 S.Ct. 2815, 159 L.Ed.2d 261 (2004); *United States v. Alexander,* 805 F.2d 1458, 1462 (11th Cir.1986) (holding that application of

an amendment to Rule 704(b) of the Federal Rules of Evidence, which prohibited an expert witness from stating an opinion or inference as to the legal insanity of the accused, did not violate the *ex post facto* clause, because the ingredients of the defense were not changed by the amendment of the rule); *United States v. Prickett,* 790 F.2d 35, 37 (6th Cir.1986) (also holding that application of the amendment to Rule 704(b) did not violate the *ex post facto* clause); *United States v. Mest,* 789 F.2d 1069, 1071 (4th Cir.1986) (also holding that application of the change to Rule 704(b) did not violate the *ex post facto* clause), *cert. denied,* 479 U.S. 846, 107 S.Ct. 163, 93 L.Ed.2d 102 (1986).

For similar reasons, application of the "forfeiture by wrongdoing" rule, as a matter of common law, would not violate the due process clause. In *Rogers v. Tennessee,* 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), the Supreme Court explained "that limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process." *Rogers,* 532 U.S. at 456, 121 S.Ct. 1693 (citing *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)). Nevertheless, in *Rogers,* the Court also explained that "nowhere in [*Bouie*] did we go so far as to incorporate jot-for-jot the specific categories of *Calder* into due process limitations on the retroactive application of judicial decisions." *Id.* at 459, 121 S.Ct. 1693. Instead, the Court explained that the due process limitation on retroactive judicial decisionmaking is "in accordance with the more basic and general principle of fair warning that *Bouie* so clearly articulated." *Id.* Ultimately, the Court concluded,

[A] judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." [*Bouie,* 378 U.S. at 354, 84 S.Ct. 1697.]

*Rogers,* 532 U.S. at 462, 121 S.Ct. 1693.

■ Johnson's reliance on a due process bar to application of the common-law "forfeiture by wrongdoing" rule is also misplaced. First, the court finds that the due process limitations on which Johnson relies do not apply to a rule of evidence, as opposed to judicial interpretations of statutory or common-law crimes and defenses. *See id.* at 453, 121 S.Ct. 1693 (applying the standards to the retroactive application of a judicial decision abolishing the common law "year and a day rule," which provided that no defendant could be convicted of murder unless his victim had died by the defendant's act within a year and a day of the act); *see also id.* at 461–62, 121 S.Ct. 1693 (noting that *Bouie* restricted due process limitations on retroactive application of judicial interpretations of criminal statutes to those that are "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," and holding that the same due process limitations would serve just as well in the common-law context, where courts "engage in the daily task of formulating and passing upon criminal defenses and interpreting such doctrines as causation and intent, reevaluating and refining them as may be necessary to bring the common law into conformity with logic and common sense").

■ Second, assuming for the sake of argument that Johnson is correct that these due process standards apply to the judicial adoption or interpretation of a rule of evidence, such as the "forfeiture by wrongdoing" rule, the court cannot say that application here of the common-law rule of "forfeiture by wrongdoing" would violate due process. Johnson did have "fair warning" that such a rule would apply, because prior to the alleged murders,

every federal circuit court that had addressed the issue, including the Eighth Circuit Court of Appeals, had recognized the doctrine. *See, e.g.,* FED. R. EVID. 804, Advisory Committee Comments, 1997 Amendments (citing *United States v. Houlihan,* 92 F.3d 1271, 1280 (1st Cir. 1996); *United States v. Aguiar,* 975 F.2d 45, 47 (2d Cir.1992); *United States v. Thevis,* 665 F.2d 616, 631 (5th Cir.1982); *Steele v. Taylor,* 684 F.2d 1193, 1202 (6th Cir.1982); *United States v. Balano,* 618 F.2d 624, 629 (10th Cir.1979); *United States v. Carlson,* 547 F.2d 1346, 1358–59 (8th Cir.1976)). The varying standards of proof for application of the common-law rule, either a preponderance of the evidence or clear and convincing evidence, *see id.* (citing cases applying each standard), did not change the substance or effect of the rule. It cannot be said that, in the circumstances of this case, application of the common-law rule of "forfeiture by wrongdoing" would be " 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.' " *Rogers,* 532 U.S. at 462, 121 S.Ct. 1693 (quoting *Bouie,* 378 U.S. at 354, 84 S.Ct. 1697).

Therefore, the court concludes that the statements by DeGeus in question here are admissible, either pursuant to the "state of mind" exception, or conditionally pursuant to the "forfeiture by wrongdoing" exception, or both. The government's motion to admit such statements will be granted.

#### c. *Admissibility of Nicholson's statements*

*i. Arguments of the parties.* The government's arguments concerning the admissibility of Nicholson's statements are much more compact. The government again argues that Nicholson's hearsay statements are admissible under the exception for "forfeiture by wrongdoing." The government also contends that the

statements are admissible under *Crawford,* even though they are "testimonial" hearsay, because equity demands forfeiture of Sixth Amendment confrontation rights where the statements qualify for the hearsay exception for "forfeiture by wrongdoing." Johnson counters that Nicholson's statements are not admissible under the "forfeiture by wrongdoing" exception, for essentially the same reasons that DeGeus's statements are not admissible under this exception. She adds that the "forfeiture by wrongdoing" exception does not apply to statements by Nicholson, because she had no right to confrontation at the time that Nicholson was killed, where no charges were pending against her at the time that Nicholson made the statements. She contends that ruling otherwise would create a "murder victim" exception to the confrontation clause. She also contends that statements by Nicholson that would not have been admissible had he been testifying against her, such as multiple hearsay or evidence inadmissible under Rule 403, cannot be admitted pursuant to the "forfeiture by wrongdoing" exception.

*ii. Analysis.* The court finds, first, that the government has also presented sufficient evidence in support of its allegations that Johnson procured Nicholson's absence for the "forfeiture by wrongdoing" exception to apply to his statements, at least conditionally. Moreover, the court is signally unimpressed by Johnson's argument that the "forfeiture by wrongdoing" exception does not apply because she had no right of confrontation as to Nicholson at the time that Nicholson made the statements. The question is whether she *now* has a right of confrontation, not whether she had such a right at the time that Nicholson made the statements. For essentially the same reasons that the court rejected her arguments that the "forfeiture by wrongdoing" exception does not apply to DeGeus, the court now rejects

those arguments as to Nicholson's statements. On the other hand, the court notes that Nicholson's statements, as characterized by the government here, appear to have little to do with Johnson, and much to do with Honken, but Johnson did not assert that the statements are simply irrelevant as to her, and the court will await proof at trial before rejecting any of the statements on relevance grounds.

Finally, the court recognizes that the confrontation clause analysis for Nicholson's statements is somewhat different from the analysis for DeGeus's statements, because all of Nicholson's statements are in the group of statements that the Supreme Court expressly identified in *Crawford* as plainly "testimonial," including "prior testimony ... before a grand jury" and statements during "police interrogations." *Crawford*, 541 U.S. at ——, 124 S.Ct. at 1374 (statements in these contexts are "testimonial," because "[t]hese are the modern practices with closest kinship to the abuses at which the confrontation clause was directed"). Nevertheless, the court reaches the same conclusion that the evidence is admissible over any confrontation clause objection. The statements are admissible over confrontation clause objections, whether or not they are "testimonial," to the extent that they are subject to the "forfeiture by wrongdoing" hearsay exception under Rule 804(b)(6). *Id.* at 1370. Thus, these statements will also be conditionally admitted, pursuant to Rule 804(b)(6) and the procedures outlined in *Emery*.

### 5. The motion to exclude evidence on aspects of the death penalty

The government's fifth motion now pending before the court is the government's December 3, 2004, Motion In Limine To Bar Discussion Or Evidence Of Certain Aspects Of The Death Penalty (docket no. 224). As in Honken's case, the government argues that the court should bar discussion or evidence of the following: (1) the death penalty or other punishment during the guilt phase of the trial; (2) the unavailability of the death penalty as a form of punishment in Iowa under Iowa law; (3) the opinions of State of Iowa officials regarding the death penalty; and (4) the deterrent effect of the death penalty (or lack thereof).

#### a. Arguments of the parties

The government asserts that evidence on these matters is inadmissible pursuant to Rules 402 and 403 of the Federal Rules of Evidence. This is so, the government contends, because punishment is ordinarily irrelevant to determination of a defendant's guilt, and juries are ordinarily so instructed. Thus, the government argues that interjection of death penalty issues into the "guilt phase" of the proceedings could mislead or confuse the jurors as to the nature of their duties in that phase of the trial, where the jurors' duty is to determine whether the government has proved the elements of each charge, not the appropriateness of any particular penalty. Although the government concedes that it is obviously necessary to discuss death penalty issues during jury selection, there should be no further mention of the death penalty until the "penalty phase" of the trial, if there is one. The government also contends that discussion of the unavailability of the death penalty under state law and the history of the death penalty in Iowa are also irrelevant and would confuse the jury, because this is a federal proceeding under federal law, and the death penalty is, therefore, available. The government contends that jurors are unlikely to have the sophistication to understand the niceties of a dual-sovereign legal system. Similarly, the government contends that, because this is a federal prosecution, the opinions of state officials regarding the death penalty are irrelevant and that in-

troduction of such opinions at any phase of the trial could only serve to confuse or mislead the jury. Finally, the government contends that discussion and evidence about the deterrent effect of the death penalty, or the lack of any deterrent effect, is irrelevant and confusing at the "guilt phase" of the trial and is equally irrelevant to any proper aggravating or mitigating factor at the "penalty phase" of the trial, not least because Congress has already made the pertinent policy determination to impose the death penalty in certain cases.

On December 16, 2004, Johnson filed a response to the government's motion. In her response, Johnson asserted that evidence about the death penalty or other punishment and evidence concerning the unavailability of the death penalty as a form of punishment in Iowa under Iowa law may come up during the "guilt phase" of this case in the testimony of Robert McNeese. She contends that this is so, because McNeese purportedly gave Johnson advice about the death penalty in an effort to get her to speak to him. Therefore, Johnson argues that this fact should properly be brought to the attention of the jury as part of the explanation of her conversation with McNeese and the deceptiveness of the government and McNeese as its agent. She does, however, agree that the opinions of State of Iowa officials regarding the death penalty are not relevant and represents, further, that she has no plans to present evidence on this subject. Finally, she contends that the last category of evidence, concerning the deterrent effect of the death penalty (or lack thereof), may be appropriate in any "penalty phase" of this trial.

### b. Analysis

In Honken's case, the court noted that the government was wise to raise these issues pre-trial, even though it appeared from the parties' written and oral arguments that there was little likelihood that the trial would devolve into a wholesale airing of death penalty policy issues. Here, it appears that Johnson intends to offer only certain categories of such evidence, and for only limited purposes. She does not, for example, assert that evidence of the opinions of State of Iowa officials about the death penalty is relevant or admissible for any purpose at her trial. Consequently, the court must consider only whether the other kinds of evidence about the death penalty identified by the government will be admissible here.

■ **i. Jury selection v. "guilt phase."** The court finds that some of the issues identified in the government's motion may, and perhaps must, be addressed during jury selection, but that they are largely irrelevant during the "guilt phase" of the trial. Specifically, in the absence of special circumstances, the following evidence is irrelevant during the "guilt phase": evidence of the unavailability of the death penalty as a form of punishment in Iowa under Iowa law; the opinions of State of Iowa officials regarding the death penalty; and the deterrent effect of the death penalty (or lack thereof). In *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court identified the problems with such evidence, in a case overturning an Alabama statute that barred jury consideration of lesser-included offenses of a capital murder charge, and thus compelled the jury to focus on the death penalty during the guilt phase of the trial:

In the final analysis the difficulty with the Alabama statute is that it interjects irrelevant considerations into the fact-finding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime. Thus, on the one hand, the unavailability

of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be. punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason— that, whatever his crime, the defendant does not deserve death. In any particular case these two extraneous factors may favor the defendant or the prosecution or they may cancel each other out. But in every case they introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case.

*Beck,* 447 U.S. at 642–43, 100 S.Ct. 2382 (footnote omitted). The court concludes that these concerns apply to the "death penalty" evidence at issue here. Therefore, such evidence is inadmissible, at least to the extent that it was not a topic of discussion between Johnson and McNeese.

 **ii. Death penalty issues that "arose" in conversations.** Johnson, however, contends that evidence about the death penalty or other punishment and about the unavailability of the death penalty as a form of punishment in Iowa under Iowa law may "arise" in the "guilt phase," because McNeese purportedly gave her advice about the death penalty in an effort to get her to speak to him. She contends that this evidence may properly be brought to the jury's attention as part of the explanation for her conversations with McNeese and to show the deceptiveness of the government and McNeese as the government's agent. Johnson has not informed the court of what she asserts were the precise contents of her conversations with McNeese, so that the court cannot fully evaluate the extent to which certain evidence about the death penalty may be relevant in light of those conversations. Nevertheless, to the extent that Johnson

can show that certain death penalty issues "arose" in her conversations with McNeese, evidence of the *conversations* may be probative of the matters Johnson asserts. Evidence of the extent to which McNeese's information about death penalty issues was true may also have some probative value to show his deceptiveness, but it seems to the court that the more probative issue is the extent to which Johnson relied on any information that McNeese provided. The ultimate determination of just what evidence of aspects of the death penalty should be admissible in light of Johnson's conversations with McNeese, thus, may have to wait until trial. For now, the court notes its considerable doubt that the limited context in which such evidence may be probative will open the door to a wholesale exploration of death penalty issues, the availability or unavailability of the death penalty in Iowa, or the reasons that the death penalty is not available under Iowa law.

Therefore, only to the limited extent that Johnson can show that the issues "arose" in her conversations with McNeese will evidence about the death penalty (or other punishment) or the unavailability of the death penalty in Iowa under Iowa law be admissible. The court will also exercise tight control to prevent confusion of the issues, misleading the jury, or merely cumulative evidence on these issues. *See* FED. R. EVID. 403 (permitting the court to exclude probative evidence on these grounds).

 **iii. Deterrent effect of the death penalty.** A still closer question is presented on the admissibility of any of the evidence of the deterrent effect of the death penalty, or lack of any such deterrent effect, at the "penalty phase," if any, of this trial. Johnson contends that the evidence of the deterrent effect of the death penalty, or lack thereof, should be

admissible in the "penalty phase," if any, of this trial, apparently as it relates to aggravating or mitigating factors that the jury may properly consider.

Several courts, primarily in *habeas corpus* proceedings, have addressed the question of the admissibility of evidence of the deterrent effect of the death penalty at the "penalty phase" of a capital case. The consensus of such decisions appears to be that the evidence is not admissible, even during the "penalty phase," because it is not proper mitigating evidence related specifically to the defendant. *See, e.g., Williams v. Chrans,* 945 F.2d 926, 947–48 (7th Cir.1991) (holding that it was not error to exclude proffered evidence of the lack of deterrent value of the death penalty, because it could not be characterized as mitigating evidence bearing on the defendant's character, prior record, or the circumstances of the offense), *cert. denied,* 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992); *Granviel v. Lynaugh,* 881 F.2d 185, 189 (5th Cir.1989) (evidence concerning the efficacy of Texas capital statutes was irrelevant to the defendant or his crime and, therefore, was properly excluded as not relevant to mitigating circumstances), *cert. denied,* 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990); *Martin v. Wainwright,* 770 F.2d 918, 936–37 (11th Cir.1985) (barring such evidence and explaining, *inter alia,* "Evidence concerning whether the death penalty has a deterrent effect, either on potential murderers in general or on a specific category of potential murderers, is not designed to help the sentencer focus on the unique characteristics of a particular capital defendant or crime. Rather, such evidence is designed to persuade the sentencer that the legislature erred, in whole or in part, when it enacted a death penalty statute. Such evidence has never been held, either by the Supreme Court or by this court, to be 'constitutionally indispensable.' ") (footnote omitted), *modified on other grounds*

*on denial of reh'g,* 781 F.2d 185 (11th Cir.1986), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986); *United States ex rel. Coleman v. Ryan,* 1998 WL 292988, *39–41 (N.D.Ill.1998) (the state trial judge properly excluded evidence of the death penalty's lack of deterrent effect, because it was not proper "mitigation" evidence), *aff'd,* 196 F.3d 793 (7th Cir.1999), *cert. denied,* 531 U.S. 848, 121 S.Ct. 120, 148 L.Ed.2d 75 (2000); *Scott v. Dugger,* 686 F.Supp. 1488, 1511 (S.D.Fla.1988) (the trial court had properly excluded a journalist's anecdotal evidence about executions that he had witnessed and the lack of deterrent effect of the death penalty as irrelevant to any issues properly before the jury at the penalty phase), *aff'd,* 891 F.2d 800 (11th Cir.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990); *and compare Amrine v. Bowersox,* 238 F.3d 1023, 1032–33 (8th Cir.2001) (holding that admission at the penalty phase of a capital case of a prison warden's testimony that imposition of the death penalty on an inmate for murdering another inmate had had a deterrent effect on inmate-on-inmate murders did not violate the defendant's right to be free from cruel and unusual punishment under the Eighth Amendment or his due process rights under the Fourteenth Amendment), *cert. denied sub nom Amrine v. Luebbers,* 534 U.S. 963, 122 S.Ct. 372, 151 L.Ed.2d 283 (2001); *United States v. Battle,* 173 F.3d 1343, 1348–49 (11th Cir.1999) (distinguishing *Martin,* 770 F.2d at 936–37, to uphold admission of a guard's testimony about how the sentence of the killer of a guard would affect the guards and prisoners as the evidence "was not about deterrence as deterrence is normally discussed in our cases"), *cert. denied,* 529 U.S. 1022, 120 S.Ct. 1428, 146 L.Ed.2d 318 (2000). The court concurs with the conclusions of these courts and holds that evidence of the deterrent effect of the death penalty, or the

lack of any such deterrence, on death-sentenced defendants is not admissible in the "penalty phase" of this trial and certainly is not admissible in the "guilt phase."

The court is not convinced that evidence that the death penalty does not deter death-sentenced murderers from future acts of violence is any more closely related to this defendant's character, her record, or the circumstances of the offenses charged for purposes of an *aggravating* factor than it is for purposes of a *mitigating* factor, *see Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (holding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in the original), where the lack of such a relationship is the rationale for excluding such evidence in the decisions cited above. Therefore, notwithstanding Johnson's contentions, evidence that penalties other than death deter murderers from future acts of violence and that the death penalty does not deter death-sentenced murderers from future acts of violence on the issue of Johnson's future dangerousness or any other aggravating or mitigating factor, will be precluded in the "penalty phase," if any, of this trial.

With the specific exceptions noted here, the government's motion to bar discussion or evidence of certain aspects of the death penalty will be granted.

### 6. The motion to exclude evidence of Cutkomp's instances of public exposure

In this case, as in Honken's case, the government has also filed a Motion In Limine Regarding Timothy Cutkomp's Instances Of Public Exposure (docket no. 225). The government explains that Mr. Cutkomp, one of the government's witnesses in its case-in-chief, was convicted on March 24, 1995, in the Iowa District Court for Cerro Gordo County of the crime of indecent exposure, a misdemeanor, in violation of Iowa Code § 709.9; that he was arrested twice for such conduct, but not prosecuted; and that he admitted at Honken's sentencing hearing in 1997 that he had engaged in numerous other instances of indecent exposure, including a few instances while he was in Arizona in 1992 and many more subsequently in Iowa.

### a. Arguments of the parties

Also as in Honken's case, the government now argues that Cutkomp's conviction for indecent exposure is not admissible under Rule 609(a) of the Federal Rules of Evidence, because the conviction was for a misdemeanor not punishable by more than one year of incarceration, nor is it a conviction for a crime that involved dishonesty or a false statement. The government argues that Cutkomp's admissions concerning other instances of indecent exposure are likewise inadmissible under Rule 608 of the Federal Rules of Evidence, because they are not probative of his truthfulness or untruthfulness. Acts indicating a proclivity to engage in inappropriate conduct, the government contends, are not subject to inquiry, even on cross-examination.

Even if evidence of Cutkomp's acts of indecent exposure might otherwise be admissible, the government argues that the court should exclude such evidence pursuant to Rule 403 of the Federal Rules of Evidence, because the evidence is unfairly prejudicial and of little or no probative value. The government argues that the prejudice would be the tendency of the

evidence to cause jurors to evaluate Cutkomp's testimony on the inappropriate ground of an emotional response to his acts of indecent exposure. Moreover, the government contends that the evidence does not, in any way, make facts at issue in the case against Johnson any clearer. The government contends that inquiry into these incidents would be an unwarranted intrusion into the private life of the witness, because it would embarrass Cutkomp, and would confuse or mislead the jury as to what issues are really on trial here. Thus, the government contends that presentation of this evidence would be a prejudicial misdirection.

On December 13, 2004, Johnson responded to the government's motion by stating that she has no objection to the government's motion in limine regarding Timothy Cutkomp's instances of public exposure.

#### b. Analysis

■ Although the issue of the admissibility of evidence of Cutkomp's instances of public exposure was a contentious one both before and during the trial in Honken's case, Johnson clearly does not intend to press for the admissibility of such evidence. Consequently, the court's analysis of the issue can be very brief. Evidence of a felony conviction is admissible under Rule 609(a)(1) of the Federal Rules of Evidence, subject to the limitations of Rule 403. FED. R. EVID. 609(a)(1); *Jones v. TEK Indus., Inc.*, 319 F.3d 355, 360 (8th Cir.2003). Similarly, evidence of a conviction for a crime involving "dishonesty or false statement" is admissible "regardless of the punishment" under Rule 609(a)(2). FED. R. EVID. 609(a)(2). It is readily apparent that Cutkomp's conviction for misdemeanor indecent exposure is not admissible under Rule 609(a), because it is neither a conviction for a felony nor a conviction for a crime involving "dishonesty or false statement." Thus, no Rule 403

balancing is required as to that conviction; it simply is not admissible pursuant to Rule 609. Similarly, Rule 608 does not permit the admission of evidence of uncharged instances of indecent exposure, because it is not evidence of Cutkomp's character for truthfulness or untruthfulness. *See* FED. R. EVID. 608.

The evidence of instances of indecent exposure also is not admissible pursuant to Rules 401 and 402, because *the underlying conduct* is not probative of Cutkomp's mental state, memory, perception, or character for truthfulness. Moreover, even if the underlying conduct were somehow marginally probative of these issues, the court finds that the potential for unfair prejudice from evidence that the underlying conduct was indecent exposure clearly outweighs that limited probative value, warranting exclusion of that evidence pursuant to Rule 403. The unfair prejudice from this evidence, as the government suggests, is that the jury will make a determination of Cutkomp's credibility on the improper, emotional basis of a reaction to the nature of his instances of indecent exposure, not on the basis of any indications of impairment of his memory or perception that might arise from a mental condition of which the instances of indecent exposure might be a symptom.

Therefore, as in Honken's case, the court concludes that the government's motion to exclude evidence of Cutkomp's instances of indecent exposure will be granted to the extent that the parties, counsel, and witnesses may not make any reference to, ask questions concerning, or introduce evidence of witness Timothy Cutkomp's past behavior of indecent exposure. Should it become necessary to refer to these instances at all, they may be referred to as "a misdemeanor conviction" and "acts constituting misdemeanor violations of the law."

### 7. The motion to admit a replica firearm

The government's final motion now pending is another return to territory explored in the Honken case. That motion is the government's December 3, 2004, Rule 104(c) Motion For Admission Of A Replica Firearm (docket no. 226). To put this motion in context, the court will first consider some additional factual background.

#### a. Additional factual background

The government asserts that the evidence at trial will show the following facts: that Johnson purchased a Tec–9 semi-automatic firearm at a pawn shop in Waterloo, Iowa, in July 1993; that two other witnesses described a weapon matching the description of a Tec–9 in the possession of Johnson and Honken; that Timothy Cutkomp assisted Honken in using welding equipment to cut up and melt down a firearm matching the description of a Tec–9, then helped Honken dispose of the remains of the weapon by throwing the pieces into ditches; that medical examiners, a forensic expert, and a ballistics expert will testify that the murder victims' remains bear injuries consistent with bullet wounds, that some of the bullets and bullet fragments recovered from remains are "not inconsistent with" 9 mm bullets, and that the bullets are consistent with only a limited number of weapons, including a Tec–9.

#### b. Arguments of the parties

In support of this motion, the government states that it intends to introduce, as demonstrative evidence, a Tec–9 firearm similar to the one purchased by Angela Johnson and destroyed by Dustin Honken to assist the jury in its evaluation of the charges against Johnson. The government will not offer the replica as the actual weapon purchased by Johnson or identified by witnesses as having been in Johnson's or Honken's possession. The government asserts that the replica should be admitted, with proper cautionary instructions, to assist the jury in understanding the evidence in the case.

Johnson states that she has reviewed this court's prior ruling on this issue and, consequently, asserts that this motion is not truly determinable on a pretrial basis, because it requires witness testimony to establish the necessary foundation for the evidence in question. She also asserts that the government's evidence on the type of firearm or firearms is not clear and consistent, such that a number of potential weapons could have been used in the killings and seen by the witnesses more than a decade ago. Therefore, she contends that allowing the government to single out a particular make and model of firearm to use as a demonstrative replica would be unfairly prejudicial.

#### c. Analysis

Both the Eighth Circuit Court of Appeals and its sister circuits "have previously approved the use of replica evidence, more specifically guns, for demonstrative purposes." *United States v. Parks,* 364 F.3d 902, 907 (8th Cir.2004) (citing *United States v. McIntosh,* 23 F.3d 1454, 1456 (8th Cir.), *cert. denied,* 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994); and *Flores v. State of Minnesota,* 906 F.2d 1300, 1304 (8th Cir.), *cert. denied,* 498 U.S. 945, 111 S.Ct. 359, 112 L.Ed.2d 322 (1990), as examples from this circuit, and *United States v. Aldaco,* 201 F.3d 979, 986 (7th Cir.2000); *United States v. Russell,* 971 F.2d 1098, 1105 (4th Cir.1992), *cert. denied,* 506 U.S. 1066, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993); *United States v. Ferreira,* 821 F.2d 1, 6 (1st Cir.1987); and *Banning v. United States,* 130 F.2d 330, 335–36 (6th Cir.1942), as examples from other circuits), *petition for cert. filed,* (July 13, 2004) (No. 04–5305). Nevertheless, the

Eighth Circuit Court of Appeals has considered the admissibility of such evidence, even for demonstrative purposes, by balancing the prejudicial effect and the probative value of such evidence. *Parks,* 364 F.3d at 907; *United States v. McIntosh,* 23 F.3d 1454, 1456–57 (8th Cir.), *cert. denied,* 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994). Some time ago, the Eighth Circuit Court of Appeals also concluded that the "traditional justification" for the admission of a "similar" weapon—in that case, a weapon "found in the possession of a defendant but which could not be positively identified as that used in a crime"—was "cut away" where "there was positive evidence that the pistol admitted was *not* similar to the one used in the crime." *United States v. Wynde,* 579 F.2d 1088, 1094 (8th Cir.) (emphasis in the original), *cert. denied,* 439 U.S. 871, 99 S.Ct. 204, 58 L.Ed.2d 184 (1978). Consequently, the court held that the evidence "must be seen as irrelevant since it was not probative of the proposition that the accused committed the crime charged." *Id.* Thus, these authorities suggest not only that the admissibility of a replica depends upon a balancing of probative value against prejudice, *see Parks,* 364 F.3d at 907, but that the probative value depends upon whether there is reliable evidence that the defendant possessed and used in the crime a weapon of the same type as the replica. *See Wynde,* 579 F.2d at 1094.

■ As to the "probative value" prong of the analysis, a replica may be used to bolster or refute a witness's testimony that the defendant possessed or used a weapon of the same type as the replica. *See McIntosh,* 23 F.3d at 1456–57 (a replica could be used to help the jury assess the credibility of witnesses' testimony that the witness had a certain kind of weapon in a holster under his jacket); *accord Aldaco,* 201 F.3d at 986–87 (a replica could be used to illustrate what a witness saw and to allow the jury to determine whether events happened as the witness testified that they did). If the evidence at trial relating to Johnson's and Honken's possession of a firearm matching the description of a Tec–9 is essentially as the government now characterizes it, that evidence will probably be sufficient to establish the probative value of the replica firearm, for example, to assist the jury in determining whether the witnesses actually could have seen a Tec–9 in Honken's or Johnson's possession as those witnesses will purportedly testify. *See id.; Aldaco,* 201 F.3d at 986. However, final determination on this prong of the inquiry must await trial.

■ Turning to the "prejudice" prong of the analysis, the "prejudice" usually at issue is the potential for the jury to be confused about whether the replica is the weapon actually used in the offense. *See Parks,* 364 F.3d at 907 ("the potential prejudice" was "jury confusion over whether the guns displayed in court were the actual guns at issue"); *McIntosh,* 23 F.3d at 1456 (there was no prejudice, because the government explained that the replicas were not the actual items possessed by the defendant); *accord Aldaco,* 201 F.3d at 986 (the only potential prejudice identified by the defendant was jury confusion over whether the gun displayed in court was actually the shotgun in the defendant's hand at the time of his arrest). However, that prejudice can be ameliorated, for example, where the government makes clear in its use of the replica that it is *not* the actual weapon used or carried by the defendant, the court gives a proper limiting instruction, and the replica is not left on display in the courtroom or given to the jury during deliberations. *Id.* (the replica could not be used during deliberations and the court gave a proper cautionary instruction); *McIntosh,* 23 F.3d at 1456 (the government conceded to the jury that the items did not come from the defendant);

*accord Aldaco,* 201 F.3d at 986 (the government made clear to the jury that the replica was not the actual weapon possessed by the defendant and the court prohibited the government from keeping the replica in the courtroom in plain view of the jury during the trial).

Johnson asserts a slightly different kind of prejudice, prejudice arising from the inference that a particular make and model of firearm is the appropriate replica of the firearm allegedly possessed or used by Honken and Johnson, when the forensic and eye-witness evidence is far from conclusive. The remedy for such prejudice, however, is Johnson's own opportunity to cross-examine witnesses and challenge identification evidence, possibly by offering her own "replica" as the proper comparator or to demonstrate the likelihood that witness identifications are unreliable. Under appropriate circumstances, the court might also give a limiting instruction that it is for the jury to determine what weapon, if any, was possessed, used, or destroyed by Honken or Johnson, and what weapon was used in the commission of the murders, based on all of the evidence presented.

■■■ Finally, this court concluded in Honken's case that, to avoid the potential prejudice arising from the suggestion that the defendant is a bad person, simply because he or she toted an evil-looking semi-automatic weapon, the evidence at trial must be sufficient to establish both that Johnson possessed a weapon matching the description of a Tec–9 *and* that a Tec–9 could reasonably have been the murder weapon, before use of a replica Tec–9 as a demonstrative exhibit would be appropriate. *See Wynde,* 579 F.2d at 1094 (rejecting use of a "replica" when such evidence

was missing). The court reaffirms that conclusion here.

In an abundance of caution, therefore, the court will reserve for trial an assessment of whether the government has established the admissibility, for demonstrative purposes, of a replica of a Tec–9 semi-automatic pistol.[8]

### B. Johnson's Motions

Defendant Johnson has also filed several pretrial motions. Those motions, *inter alia,* request a change of venue for trial, seek a determination of the admissibility of certain evidence, and request a transcript of the trial in the case of her co-defendant, Dustin Honken. The court will consider Johnson's motions in turn.

### 1. The motion for change of venue

The first of Johnson's motions now before the court is her November 4, 2004, Motion For Change Of Venue (docket no. 204). The government resisted that motion on November 9, 2004. The court notified both parties during a telephone conference on November 17, 2004, that the court required further briefing on the specific issue of whether jurors' knowledge or potential knowledge of the trial of Johnson's co-defendant, Honken, and the verdicts against him would require moving Johnson's trial. The government filed its supplemental brief on December 1, 2004, and Johnson filed hers on December 4, 2004.

### a. Arguments of the parties

In her original motion, Johnson argued that pretrial publicity—relating to the crimes, the recovery of the bodies, and Honken's trial, conviction, and death sen-

---

8. To the extent that the replica Tec–9 would be admissible as to only some of the charges, such as Counts 1 through 10, and possibly Count 12, but not to all of them, the issue of what, if any, limiting instruction is required with regard to the replica firearm must also be reserved for trial.

tence—have so infected community sentiment that she cannot receive a fair trial in this district. Because of the rarity of the tragic events at issue, the relatively small population of this district, and the media saturation, she contends that the members of the jury pool have been tainted. The situation, she contends, is so extreme that prejudice from pretrial publicity can be presumed. She argues that, under the circumstances, it is within the court's sound discretion to transfer venue of this case to another district not so infected.

The government, however, contends in its response that publicity surrounding this case has not been so extensive or corrupting as to justify moving the trial out of this district. Even if Sioux City is not an appropriate location for trial, the government asserts that an intradistrict transfer to Cedar Rapids would be appropriate, because there has been relatively little publicity about this case in the Cedar Rapids area. The government argues that Johnson must, but cannot, establish actual prejudice or circumstances warranting a presumption of prejudice to her ability to obtain a fair trial before a change of venue is appropriate. The government asserts that the passage of time since the alleged murders and since Honken's trial have mitigated the potential for prejudice in this case. The government also asserts that the court has the authority to customize the area from which the jury pool is drawn to minimize the effects of media coverage on the potential jurors.

In reply, Johnson argues that the government is applying the wrong standard, relying on cases involving appeals from denial of motions for a change of venue. She contends that the standard that the trial court must use is one of discretion to determine whether there is a reasonable likelihood that the defendant's right to a fair trial has been compromised. Johnson also argues that the government is ignoring the potential for community pressure on jurors to convict as a result of the media coverage of Honken's trial.

In its supplemental resistance, the government asserts that publicity does not justify a change of venue, even when a co-defendant has been found guilty, because that circumstance does not change the analysis or lower the defendant's burden. This is so, at least in part, the government argues, because the effectiveness of voir dire to detect juror bias is not somehow diminished by the existence of an earlier verdict in a related case. The government also points out that the juror questionnaire asks whether or not potential jurors are aware of pretrial publicity about the case, so that counsel will be sufficiently prepared for voir dire on the issue.

In Johnson's supplemental memorandum, Johnson argues that the highly-publicized verdicts in the Honken trial would not be admissible in the "guilt phase" of her trial, nor would the highly-publicized testimony of various jailhouse informants, which was admissible against Honken, be admissible in any phase of her trial. She contends that, based on the scope of the publicity, it is exceedingly likely that the vast majority of potential jurors in this district would have knowledge of inadmissible matter. She also contends that, if any juror who professed ignorance of these matters were to discover information about them after voir dire, that would be grounds for a mistrial. She contends that, while decisions from this circuit suggest that a potential juror's knowledge of a co-defendant's trial and conviction is not necessarily disqualifying, the better rule is to excuse any such jurors. Under the circumstances, she contends that jury selection in this district would require calling a huge pool of jurors, probably followed by sequestration of selected jurors, while a belated decision to transfer venue after

jury selection has started would be disruptive and prejudicial. Therefore, she now suggests that a transfer is appropriate pursuant to Rule 21(b), for the convenience of the parties and in the interests of justice, as well as or in the alternative to a transfer pursuant to Rule 21(a), on the basis of prejudice. Indeed, the focus of Johnson's oral arguments was on a transfer pursuant to Rule 21(b) rather than pursuant to Rule 21(a). Also in the course of her oral arguments, Johnson requested that she be allowed to do a poll to determine the extent to which publicity has actually infected public opinion.

Apart from the government's suggestions that the trial in this matter could be transferred within this district, neither of the parties suggested in briefing where the trial should be held, if the court does order a change of venue. However, in the course of the November 17, 2004, conference, the parties appeared to agree that Minneapolis, Sioux Falls, or Kansas City would each be acceptable venues, if the court does indeed decide to transfer venue for trial.

### b. Analysis

**i. Applicable law.** The first question raised by the parties' arguments is what standard is applicable to Johnson's motion for a change of venue for trial. Rule 21 of the Federal Rules of Criminal Procedure provides for a transfer of venue for trial, as follows:

> (a) **For Prejudice.** Upon the defendant's motion, the court *must* transfer the proceeding against that defendant to another district *if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.*
>
> (b) **For Convenience.** Upon the defendant's motion, the court may transfer the proceeding, or one or more counts,

against that defendant to another district for the convenience of the parties and witnesses and in the interest of justice.

FED. R. CRIM. P. 21(a) & (b) (emphasis added). Where the motion for change of venue is pursuant to Rule 21(a) and is based on pretrial publicity, the Eighth Circuit Court of Appeals has explained the applicable standards as follows:

> When a change of venue is requested due to pretrial publicity, we engage in a two-tiered analysis. First, we must determine whether the pretrial publicity was "so extensive and corrupting" that we must presume "unfairness of constitutional magnitude" existed. [*United States v. Blom*, 242 F.3d 799, 803 (8th Cir.2001)] (quoted sources and internal marks omitted)[, *cert. denied*, 534 U.S. 880, 122 S.Ct. 184, 151 L.Ed.2d 128 (2001)].... Second, if we were to determine that the pretrial publicity was not so corrupting as to warrant a presumption of unfairness, then we must look at the voir dire testimony of those who became trial jurors to determine if they "demonstrated such actual prejudice that it was an abuse of discretion to deny a timely change-of-venue motion." [*Id.*]

*United States v. Nelson*, 347 F.3d 701, 707–08 (8th Cir.2003), *cert. denied*, —— U.S. ——, 125 S.Ct. 486, 160 L.Ed.2d 355 (2004); *United States v. Allee*, 299 F.3d 996, 1000 (8th Cir.2002) (stating the same two-tiered analysis); *United States v. Blom*, 242 F.3d 799, 803 (8th Cir.2001) (same), *cert. denied*, 534 U.S. 880, 122 S.Ct. 184, 151 L.Ed.2d 128 (2001). The court has repeatedly explained that a district court's *denial* of a motion for change of venue is reviewed for abuse of discretion. *See, e.g., Nelson*, 347 F.3d at 707; *Allee*, 299 F.3d at 999; *Blom*, 242 F.3d at 803 (same).

■ Johnson, however, contends that this two-tiered "prejudice" analysis may be appropriate for appellate review, but that the standard in the first instance is one of discretion on the trial court's part to determine whether there is a reasonable likelihood that the defendant's right to a fair trial has been compromised, citing *United States v. Stevens*, 83 F.3d 60, 66 (2d Cir.), *cert. denied*, 519 U.S. 902, 117 S.Ct. 255, 136 L.Ed.2d 181 (1996). The court does not agree. The decision in *Blom* makes clear that, in this circuit, the two-tiered analysis is the appropriate analysis for the district court, as well as the appellate court, to apply. *See Blom*, 242 F.3d at 803–04 (the defendant complained that the district court had abused its discretion by using the two-tiered prejudice or "due process" analysis, drawn from *Pruett v. Norris*, 153 F.3d 579, 585–87 (8th Cir.1998), and *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), but the appellate court held that the court did not abuse its discretion in applying that analysis). Rule 21(a) also expressly requires that the district court be "satisfied that so great a prejudice against the defendant *exists* in the transferring district that the defendant cannot obtain a fair and impartial trial there"—it does not state a "reasonable likelihood" standard. FED. R. CRIM. P. 21(a) (emphasis added). Therefore, this court will also apply the two-tiered "prejudice" analysis to Johnson's motion to transfer pursuant to Rule 21(a).

■ Of course, at this point in the proceedings, only the first tier of the analysis is applicable, because Johnson relies solely on pretrial publicity and no voir dire has taken place. At this first tier of the

analysis, the court must determine whether the pretrial publicity was "so extensive and corrupting" that the court must presume "unfairness of constitutional magnitude." *Nelson*, 347 F.3d at 707. The court must be mindful "that 'the presumption of inherent prejudice is reserved for rare and extreme cases,' [citation omitted,] and that a defendant 'must satisfy a high threshold of proof in order to prove inherent prejudice.'" *Id.* at 707–08 (first quoting *Blom*, 242 F.3d at 803, then quoting *Pruett*, 153 F.3d at 585).

In *Nelson*, the court found that no presumption of unfairness was warranted, where, *inter alia*, there was a two-year delay between the murder and the trial, because "[g]enerally, we have concluded that there should be no presumption of inherent unfairness where there has been a substantial delay between the criminal act and the trial." *Id.* at 709 (citing cases).[9] The court also rejected a presumption of prejudice where preliminary juror questionnaires indicated that only 29% of the jurors had formed strong or fixed opinions about the case, because the court had rejected a presumption of partiality in circumstances where questionnaires revealed a similar or higher percentage of bias. *Id.* (citing cases).

■ In addition to considering the delay between the crime and the trial, the Eighth Circuit Court of Appeals has considered the extent and nature of pretrial media coverage. In *Allee*, the court noted that "[t]he mere existence of press coverage, however, is not sufficient to create a presumption of inherent prejudice"; rather, "[t]o create a presumption, the cover-

---

**9.** In *Nelson*, the court also found that no presumption of prejudice was appropriate as to media reports that the defendant characterized as announcements that he was guilty of the crime, where the defendant had pleaded guilty, so that a change of venue was only at

issue for the "penalty phase." *Nelson*, 347 F.3d at 708–09. Here, however, Johnson has not pleaded guilty, so that the court must address the question of whether prejudice to Johnson can be presumed in either the "merits phase" or the "penalty phase."

age must be inflammatory and accusatory." *Allee*, 299 F.3d at 1000; *accord Blom*, 242 F.3d at 804 (also considering whether the coverage was extensive and whether that coverage was "inflammatory or accusatory"); *Pruett*, 153 F.3d at 585 (merely documenting the quantum of media coverage is not enough). Even so, "[i]solated incidents of intemperate commentary about the crimes and perpetrators ... do not rise to the level of inflammatory or accusatory [reports] where for the most part, the reporting appears to have been objective and unemotional." *Id.*

The court must also consider "the time frames in which the bulk of the coverage occurred," including such incidents as the crimes themselves, any arrests, periods encompassing a guilty plea, or periods encompassing an unusual event, such as a jailbreak, and the time of those events relative to the time of trial, *id.*; the extent to which the defendant had himself or herself invited the pretrial publicity, *see Pruett*, 153 F.3d at 585 (the defendant had made several statements to the media in which he implicated himself in the crimes and described himself as a "mad-dog killer"); and whether a "circus atmosphere" prevailed around the trial owing to the amount and nature of the media attention. *Id.* at 586 (finding that the media attention was "largely unexceptional, perhaps even less pervasive and inflammatory than publicity generated in similar cases," so that there was no such "circus atmosphere"); *Snell v. Lockhart*, 14 F.3d 1289, 1293 (8th Cir.) ("Prejudice may be 'presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.'") (quoting *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986)), *cert. denied sub nom. Snell v. Norris*, 513 U.S. 960, 115 S.Ct. 419, 130 L.Ed.2d 334 (1994).

Furthermore, in *Blom*, the court noted that the district court had taken precautions designed to assure the selection of an unbiased jury, despite extensive media coverage, including moving the trial within the district, assembling an unusually large jury pool, expanding the area from which jurors were drawn and excluding areas in which the crime occurred, using pretrial questionnaires to probe prospective jurors' exposure to pretrial publicity, and increasing each side's number of peremptory strikes. *Blom*, 242 F.3d at 804. Thus, the presumption of prejudice is not appropriate if potential prejudice can be sufficiently mitigated by reasonable measures.

The real question here, however, is the effect of a specific kind of pretrial publicity, publicity about a co-defendant's trial, conviction, and death sentence in a state that does not, itself, have the death penalty. A quarter century ago, the Eighth Circuit Court of Appeals confronted a similar situation in *Witham v. Mabry*, 596 F.2d 293 (8th Cir.1979), albeit on a petition for *habeas corpus* relief from a state court conviction. In *Witham*, the petitioner asserted that his trial counsel was ineffective for failing to seek a change of venue or continuance, when his trial was held just ten days after a co-defendant's trial, in the same courtroom, before the same judge, and approximately one month before the trials, a national magazine, *True Detective*, sold in the area, devoted seven pages to the charged murder, including the suggestion that the defendants were to blame. *Witham*, 596 F.2d at 298. The petitioner contended that, because of the proximity of the co-defendant's trial to the petitioner's own and the inflammatory article in the magazine, he could not get a fair trial in the county where he was charged. *Id.* The court was "trouble[d]" by these facts, and found that they "raise[d] some question about the impartiality of the locale

where petitioner was tried," but nevertheless rejected the claim of ineffective assistance of counsel. *Id.* The portions of the court's reasoning relevant here are the court's observation that the magazine that carried the inflammatory article was a national one, so that a change of venue would not alleviate its prejudicial impact, and the petitioner's counsel testified that, although the co-defendant had just been tried for the same offense as the petitioner, counsel made a tactical decision not to try to move the trial, because he had been practicing with relative success in the county for twenty years and was well-known there. *Id.* The court also noted that the petitioner's defense implied that the co-defendant was the murderer, so that counsel might well have assumed that his client would be better off if the trial were held soon after the co-defendant had actually been convicted of the murder. *Id.*

■ More recently, albeit in the context of discussing the second tier of the analysis, the Eighth Circuit Court of Appeals observed that "[t]he Constitution does not require jurors to be ignorant of the facts and issues involved in a case." *Pruett,* 153 F.3d at 587. Rather, the issue is whether the jurors "can lay aside [their] impression or opinion and render a verdict based on the evidence presented at trial." *Id.* In the context of the first tier of the analysis, when the question is whether prejudice can be presumed, this court believes that the question also is *not* whether jurors can be found who know nothing about the case, but whether pretrial publicity is such that the court can presume that jurors could not lay aside impressions or opinions based on that pretrial publicity.

Also more recently, the Second Circuit Court of Appeals considered a case in which one of the defendants in the first World Trade Center bombing contended that the trial court had erred in denying his pretrial motion for a change of venue in

light of negative publicity arising from the trial of a co-defendant two years earlier. *United States v. Yousef,* 327 F.3d 56, 155 (2d. Cir.), *cert. denied,* 540 U.S. 993, 124 S.Ct. 492, 157 L.Ed.2d 392 (2003). The court, however, found that "press coverage had substantially subsided by the time Yousef was brought to trial, and there was minimal publicity in the months preceding his trial." *Id.* The court also noted that the news stories upon which the defendant relied were not about his involvement in the bombing, but about speculation that he may have been involved in other crimes, such as the Oklahoma City bombing. *Id.* (also rejecting the claim at the second tier of the analysis, because the trial court conducted an extensive voir dire and the jurors who were picked had either never heard of the defendant or could not remember any of the details of his alleged involvement in the bombing).

The Second Circuit Court of Appeals also considered certain defendants' motion for change of venue of their federal drug-trafficking trial after a co-defendant was convicted of murder in state court in *United States v. Washington,* 48 F.3d 73, 78 (2d Cir.1995). The defendants contended that the co-defendant's conviction and the events involved were "common knowledge" within the venue, so that they could not get a fair trial on the charges against them. The trial court denied the motion, applying the more generous standard advocated by Johnson here, which considers whether there is a "reasonable likelihood of compromising [the defendants'] right to a fair and impartial jury." *Id.* The trial court excused any prospective jurors who knew about the co-defendant's conviction for the murder or who had formed an opinion about the case that prevented their impartial deliberation, but did not excuse jurors who reported exposure to pretrial publicity who stated that they could try the case fairly. The appellate court af-

firmed, finding that the trial court acted within its discretion in denying the motion for change of venue. *Id.*[10]

Similarly, the Fourth Circuit Court of Appeals rejected a motion for a change of venue by James Bakker, a central figure in the PTL ministry financial scandal, based on presumed prejudice, despite publicity about the recent trial of two of his former assistants and the plea agreement entered into by his co-defendant. *United States v. Bakker,* 925 F.2d 728, 732 (4th Cir.1991). The appellate court concluded that the trial court had properly found that the vast majority of the evidence of pretrial publicity reflected unemotional, factual reports of the legal proceedings with no prejudicial impact on Bakker; that the bulk of media attention with respect to Bakker himself occurred about two years earlier when his scandal broke, but had subsided by the time of his trial; and that Bakker himself had been the source of much of the media attention. *Id.* at 732–33. The trial court also had properly declined to presume prejudice, the appellate court concluded, where Bakker had not shown that a jury substantially less subject to publicity could be impaneled in another location, because inflammatory pretrial publicity had been disseminated more broadly outside of the district than inside it. *Id.* 733.

 The court must also briefly consider the standards applicable to a motion for change of venue pursuant to Rule 21(b). Again, subdivision (b) of Rule 21 provides that the court may order a change of venue "for the convenience of the parties and witnesses and in the interest of justice." FED. R. CRIM. P. 21(b). The advisory committee noted in support of the 1966 amendment to this provision of Rule 21 that the provision states standards similar to those applicable to civil cases by virtue of 28 U.S.C. § 1404(a). *Id.,* Advisory Committee Notes, 1966 Amendment. Not surprisingly, therefore, the Eighth Circuit Court of Appeals has considered the following factors on a motion for change of venue pursuant to Rule 21(b), which are comparable to factors relevant to a motion for change of venue of a civil case pursuant to 28 U.S.C. § 1404(a): (1) where the alleged criminal act occurred; (2) where the defendant resided, was arrested, and in custody; (3) where the majority of the witnesses resided; (4) whether the defendant had been able to retain counsel in the charging district; and (5) the relative loads on the dockets in the charging district and the proposed transferee district. *See United States v. Bittner,* 728 F.2d 1038, 1041 (8th Cir.1984) (citing *United States v. Keuylian,* 602 F.2d 1033, 1038 (2d Cir.1979), as discussing and applying these factors to a Rule 21(b) motion to transfer venue); *Keuylian,* 602 F.2d at 1038 (listing the "basic factors to be considered by the district court in deciding such a motion for transfer" as including the following: "(1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) possible disruption of defendant's business if the case is not transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of the place of trial; (9) docket conditions of each district involved," and noting that the court should also consider " 'any other special elements which might affect the transfer,' " quoting *Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 240, 244, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964)); *and compare Terra Int'l, Inc. v. Mississippi Chem. Corp.,* 119 F.3d 688, 691 (8th Cir.1997) (noting that the "enu-

---

**10.** The appellate court also affirmed the trial court's denial of the defendants' request for a change of venue premised on the fact that they were black men from New York City who were being tried in a rural area with a largely white population. *Washington,* 48 F.3d at 78.

merated factors" in 28 U.S.C. § 1404(a), for transfer of a civil case, are "(1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice," but that "case-specific factors" should also be considered), *cert. denied*, 522 U.S. 1029, 118 S.Ct. 629, 139 L.Ed.2d 609 (1997).

■ *ii. Application of the law.* At this point, in the first tier of the applicable analysis, the court has reservations about whether Johnson will ultimately be able to meet the "high threshold of proof" to show that this is one of the "rare and extreme cases" in which the court can presume "inherent prejudice" based on pretrial publicity, such that a transfer pursuant to Rule 21(a) is appropriate. *Nelson*, 347 F.3d at 707–8. While there can be little doubt that the pretrial publicity has been "extensive"—perhaps more extensive than the pretrial publicity for any other case in Iowa history—the court has some doubt that the pretrial publicity has been sufficiently "corrupting" that the court must presume "unfairness of constitutional magnitude." *Id.* at 707. As the Eighth Circuit Court of Appeals explained, "[t]he mere existence of press coverage ... is not sufficient to create a presumption of inherent prejudice," and Johnson has not identified *any* individual press reports or series of press reports that could be characterized as "inflammatory and accusatory." *Allee*, 299 F.3d at 1000; *Blom*, 242 F.3d at 804; *cf. Pruett*, 153 F.3d at 585 (merely documenting the quantum of media coverage is not enough). Here, even if the court could pick out "[i]solated incidents of intemperate commentary" from the volumes of press clippings provided by Johnson, which Johnson herself has not attempted to do, the court finds that the majority of the reporting "appears to have been objective and unemotional," consisting almost exclusively of factual reporting—albeit with varying degrees of accuracy—of the circumstances of the case, the evidence presented in Honken's case, and the court's various rulings. *See id.* (isolated intemperate commentary is not enough, "where for the most part, the reporting appears to have been objective and unemotional"). Nevertheless, the court is mindful that pretrial publicity in Johnson's case is on-going; indeed, it is likely that such publicity will intensify as the date for trial approaches. Similarly, the court is mindful that post-trial publicity in Honken's case may arise between now and the time for Johnson's trial, as the court has post-trial motions pending in that case and cannot predict precisely when a ruling on those motions may issue or some other incident may bring that case back into the public eye. Thus, the court must be vigilant to monitor the drumbeat of publicity to ensure that Johnson can receive a fair trial, either in this or another district.

In concluding that the record does not yet firmly establish a basis for presuming prejudice, the court does not suggest that the effect of pretrial publicity has abated because of the significant delay between the alleged criminal acts, the murders in 1993, and the trial, *see Nelson*, 347 F.3d at 709, or between Honken's trial and Johnson's, *see Witham*, 596 F.2d at 298; *see also Yousef*, 327 F.3d at 155; *Bakker*, 925 F.2d at 732. Nor does the court suggest that clumps of press coverage around certain events, such as the recovery of the bodies, Johnson's motion to suppress McNeese's evidence, and Honken's trial, can be ignored, because they occurred in time frames remote from Johnson's trial. *See Allee*, 299 F.3d at 1000. The court recognizes that, here, these events have actually kept coverage of Honken's and Johnson's cases "in the news," with dramatic events, over such a significant period of time that they make it *more* likely that jurors will be aware of some facets of the two cases. Even so, the court finds no basis for concluding, on the present

record, that there was ever a "circus atmosphere" surrounding Honken's trial, conviction, and jury verdict for a death sentence, or that there is any indication that such a "circus atmosphere" is likely to prevail around Johnson's trial, if it is held in this district. *See Pruett,* 153 F.3d at 586.

Nor has Johnson thus far convinced the court that Honken's trial, conviction, and jury verdict for a death sentence, just a few months before she is set to go to trial, have changed the situation. As in *Witham,* Johnson appears likely to rely on a contention that Honken is the "shooter," so that there is a possibility that she would actually be better off if trial is held soon after Honken was actually convicted of the murders with which she is also charged. *See Witham,* 596 F.2d at 298. Moreover, "[t]he Constitution does not require jurors to be ignorant of the facts and issues involved in a case," but instead requires a determination of whether pretrial publicity is such that the court can *presume* that jurors *cannot* "lay aside [their] impression or opinion and render a verdict based on the evidence presented at trial." *Cf. Pruett,* 153 F.3d at 587 (citing these standards for the second tier of the analysis). There is, at present, no evidence in the record about what opinions jurors may actually hold, based on any exposure to pretrial publicity, or their ability or inability to set aside their preconceptions based on such publicity; there is, at this time, only speculation about what potential jurors might know or might think. What the present record and circumstances of the case do strongly suggest is that the court and the parties must continue to monitor carefully the on-going publicity not only in Johnson's case, but in Honken's case, where post-trial motions may be resolved before Johnson's trial, to be sure that the court is aware of when, if ever, the pretrial publicity has reached the point where "inherent prejudice" must be presumed.

The present record may also be an indication of why the Eighth Circuit Court of Appeals has "often stated that it is preferable for the trial court to await voir dire before ruling on motions for a change of venue," because, at that point, "the trial court has the information necessary to conduct the due process analysis." *United States v. Green,* 983 F.2d 100, 102 (8th Cir.1992) (citing cases). This court, however, suggests that waiting until voir dire to rule on *any* motion to change venue can be unduly wasteful of the resources of the parties, impose upon potential jurors, and ultimately delay a trial. Nevertheless, there are interim measures that can be taken to determine whether the court can, indeed, presume the kind of prejudice, at the first tier of the analysis, that requires transfer of this case to a different district, before voir dire even begins.

For example, in *Nelson,* the court had available preliminary juror questionnaires indicating the extent to which potential jurors had formed strong or fixed opinions about the case. *See Nelson,* 347 F.3d at 709 (ultimately concluding that the indication from the questionnaires that only 29% of the jurors had formed such strong or fixed opinions about the case was insufficient to warrant a presumption of prejudice). Similarly, in *Blom,* the Eighth Circuit Court of Appeals also suggested the use of pretrial questionnaires to probe prospective jurors' exposure to pretrial publicity. *Blom,* 242 F.3d at 804. In Johnson's case, however, this court does not yet have answers to such questionnaires, so that the court does not yet have information about what jurors actually know and think about the case. In *Blom,* the court suggested other measures, in addition to juror questionnaires, that the trial court should use to assure the selection of an unbiased jury,

despite extensive media coverage, including moving the trial within the district, assembling an unusually large jury pool, expanding the area from which jurors are drawn and excluding areas in which the crime occurred (or this court suggests, areas where media coverage has been unusually extensive), and increasing each side's number of peremptory strikes. *Id.* This court concludes that a determination of the likely efficacy of such measures would also be informed by the results of juror questionnaires in more than one division in this district.

Therefore, this court suggested at the hearing on December 20, 2004, that the court and the parties should submit questionnaires to 600 potential jurors in the Eastern Division of the Northern District of Iowa (including the Cedar Rapids, Waterloo, and Dubuque subdivisions), where Cedar Rapids is the likely place for an intradistrict transfer of the trial, and questionnaires to another 600 potential jurors in the Western Division of the Northern District of Iowa, where this is the division in which trial is currently set. The purpose of such questionnaires would be to determine the extent, if any, to which potential jurors have actually formed strong or fixed opinions about Johnson's case. Based on the jurors' responses, the court would reconsider Johnson's motion for a change of venue based on more complete information about what potential jurors actually know and think about the case.

Although the government was in agreement with such a proposal, Johnson countered that she should be allowed to do a telephone poll of the general population in both divisions, and that, if only juror questionnaires were used, the results would be "irrelevant" or "meaningless" without including questionnaires from the alternative districts identified by the court for an out-of-district transfer. Those districts are the District of Minnesota, the District of South Dakota, and the Western District of Missouri. She also contended that a poll would allow an informative statistical analysis of results.

The court agrees that, had Johnson raised the issue of a poll months ago, and had such a poll been authorized to start soon after the verdicts in Honken's case, so that it included the impact of that case, a poll might have been appropriate. However, at this point, such a poll would be largely duplicative of dissemination of juror questionnaires. Moreover, as the government suggests, the court finds considerably more value in a survey of *actual* potential jurors, not the general public, where the question is the effect of pretrial publicity *on potential jurors,* not its effect on the general public. The court also finds that the same sort of statistical or expert analysis that could be applied to poll results could be applied to the juror questionnaires, and Johnson made no showing to the contrary. Thus, the court finds that a poll is inappropriate in this case. Finally, the court rejects Johnson's contention that the court must also authorize juror questionnaires from potential jurors in the alternative districts. The question is not what district is *least* affected by pretrial publicity, but whether pretrial publicity has been "so extensive and corrupting" *in this district* that the court must presume "unfairness of constitutional magnitude." *Nelson,* 347 F.3d at 707. Therefore, Johnson's request for leave to take a poll in support of her motion for a change of venue will be denied, but the court will authorize the dissemination of juror questionnaires to potential jurors in the Western and Eastern Divisions of the Northern District of Iowa to determine the effect, if any, of pretrial publicity on this case. The precise counties in each division in which the juror questionnaires will be disseminated will be determined in consultations with the parties.

In the mean time, the court concludes that the appropriate course as to Johnson's motion for a change of venue on "prejudice" grounds, pursuant to Rule 21(a), is to reserve ruling on the first tier of the analysis. In the mean time, the court and the parties must continue to monitor on-going publicity in both Johnson's case and Honken's case, and the court will disseminate, and the parties will receive and analyze the results of juror questionnaires from the Western and Eastern Divisions of the Northern District of Iowa. If Johnson cannot satisfy the first tier of the analysis set out in *Nelson* on the basis of the information obtained from on-going monitoring of publicity and the results of the juror questionnaires, the court will find it necessary to proceed to the second tier of the analysis by awaiting further information gathered during voir dire to decide whether or not to grant the motion for a change of venue for trial. *See Nelson*, 347 F.3d at 708 (the second tier of the analysis requires the court to consider the voir dire testimony of those who become trial jurors); *Blom*, 242 F.3d at 804 (defining the second tier of the analysis as determining "whether the jury-selection process established an inference of actual prejudice"); *Green*, 983 F.2d at 102 ("[I]t is preferable for the trial court to await voir dire before ruling on motions for a change of venue," because, at that point, "the trial court has the information necessary to conduct the due process analysis."). The court reiterates, however, that even if the juror questionnaires reveal " '[t]he existence of prejudice among prospective jurors,' " that fact alone " 'does not necessarily mean that an impartial jury cannot be impaneled.' " *Allee*, 299 F.3d at 1000–01 (quoting *United States v. Mercer*, 853 F.2d 630, 633 (8th Cir.1988)); *accord Nelson*, 347 F.3d at 709 (holding that evidence that 29% of potential jurors had strong or fixed opinions did not necessarily require a change of venue and citing cases finding

insufficient considerably higher percentages of such jurors). Johnson must ultimately convince the court that such prejudice is "inherent" and that potential jurors cannot set aside adverse opinions. *Pruett*, 153 F.3d at 583.

Although the court will defer ruling on that part of Johnson's motion for a change of venue pursuant to Rule 21(a), the court can and will deny Johnson's alternative motion for a change of venue "for the convenience of the parties and witnesses and in the interests of justice" pursuant to Rule 21(b). The essence of Johnson's argument in support of this alternative is that, because of pretrial publicity, jury selection in this district would be "harder" and "take longer," which the court has no doubt is true. However, the court has found no authority for the proposition that either the difficulty of or the time necessary for jury selection as a result of pretrial publicity is a factor relevant to a Rule 21(b) motion for change of venue. The court recognizes that if pretrial publicity does make jury selection either harder or more time consuming, then the parties will be "inconvenienced," but the court will not allow such "inconvenience" to provide a back door for transfer pursuant to Rule 21(b), where the pretrial publicity is insufficient to warrant a transfer pursuant to Rule 21(a).

Moreover, the factors that courts have identified as pertinent to a "convenience" transfer pursuant to Rule 21(b) simply do not weigh sufficiently strongly in favor of transfer out of this district to grant Johnson's alternative motion. The crimes charged occurred in this district; the defendant resided, was arrested, and is in custody in this district; the majority of witnesses reside in this district, and even supposing that travel for those witnesses to an alternative district, such as the District of Minnesota, is just as easy or easier,

it is not sufficiently easier to weigh heavily in favor of a transfer; the documents and records pertinent to the trial are in this district; the business of the participants in the trial will be just as disrupted, if not more disrupted, by a transfer out of district than it would be otherwise; the expenses to the parties and the court may actually be increased significantly by a transfer; all but one of the counsel involved are in this district, and that attorney will have to travel anyway, unless the case is transferred to Kansas City, which would require all other counsel to travel; both Sioux City and Cedar Rapids can provide accessible and technologically advanced courtrooms for trial; and it would be inappropriate to burden another district with the expense and inconvenience of this trial, which will make a substantial draw on the resources of whatever district hosts it, in the absence of a showing of prejudice to the defendant. *See Bittner,* 728 F.2d at 1041 (applying similar factors); *Kewylian,* 602 F.2d at 1038 (same). No balance of these factors that the court can reasonably draw from the record warrants a transfer of this case for trial out of district pursuant to Rule 21(b).

Therefore, that part of Johnson's motion seeking a change of venue pursuant to Rule 21(b) will be denied, but ruling will be reserved on that part of Johnson's motion seeking a change of venue pursuant to Rule 21(a). The court will reserve the issue of a change of venue pursuant to Rule 21(a) until such time as the parties and the court have had the opportunity to review juror questionnaires from potential jurors in the Western and Eastern Divisions of the Northern District of Iowa, or until such time as monitoring of on-going pretrial publicity concerning Johnson's case or post-trial publicity concerning Honken's case can be shown to justify a presumption of prejudice requiring a change of venue.

### 2. The motion for factual findings

Johnson's next three motions relate to the admissibility of evidence obtained from Johnson by Robert McNeese while both were incarcerated in the Benton County Jail shortly after Johnson's arrest. The first of these motions is Johnson's November 16, 2004, Motion For Factual Findings Re: Instructions To Elicit (docket no. 208). In that motion, Johnson requests that the court review the existing trial record and make the factual findings necessary to determine whether Robert McNeese was acting as a government agent prior to September 11, 2000, using the legal standard set forth in *United States v. Johnson,* 338 F.3d 918 (8th Cir.2003), *cert. denied,* —— U.S. ——, 125 S.Ct. 76, 160 L.Ed.2d 45 (2004).

#### a. Arguments of the parties

In support of this motion, Johnson notes that the Eighth Circuit Court of Appeals held, on the government's interlocutory appeal of this court's order suppressing evidence obtained by McNeese, that "an informant becomes a government agent for *Massiah* purposes *only* when the informant has been instructed by the police to get information about a *particular* defendant." *Johnson,* 338 F.3d at 921 (emphasis in the original). The appellate court then held that this court had not applied that "bright line rule" to the question of whether or not McNeese was a government agent prior to September 11, 2000. Thus, Johnson contends that the court must make further findings on remand, applying the correct legal standard, to determine whether or not McNeese was acting as a government agent prior to September 11, 2000.

In response, the government asserts that Johnson's motion to suppress McNeese's evidence has been fully litigated, she did not seek an order from the

Eighth Circuit Court of Appeals for further factual findings, and this court has now dismissed, without prejudice, the only counts of the original indictment in Case No. 00-3034-MWB as to which the issue of McNeese's status as a cooperator would have barred any evidence. More specifically, the government points out that this court made detailed findings about when McNeese received instructions from the government as part of its ruling on April 23, 2002. Therefore, contrary to Johnson's assertions, the government contends that the appellate court recognized that no further factual findings were required. Moreover, the government asserts that, if a remand for further findings of fact was appropriate, Johnson should have sought that relief from the appellate court. Therefore, the government contends that the time to litigate the issue is long past. The government also contends that dismissal of the first five counts and part of the seventh count of the first indictment has mooted Johnson's motion. This is so, the government contends, because McNeese's information pertained only to the counts involving the 1993 murders, but is irrelevant to the remaining counts, which do not involve those murders or involve counts as to which there was no Sixth Amendment violation.

### b. Analysis

Assuming, for the sake of argument, that dismissal of Counts 1 through 5 of the superseding indictment in Case No. CR 00-3034-MWB, and the reindictment of Counts 6 and 7 of that indictment, in amended form, as Counts 11 and 12 of the second superseding indictment in this case have not completely mooted Johnson's motion, the court is unpersuaded by Johnson's argument. The government is correct that Johnson has already litigated and appealed the precise issue she contends is "undecided," and she lost at both levels.

First, had the record supported a finding that McNeese satisfied the "bright line rule" stated in *Moore* prior to September 11, 2000, there would have been no reason for this court to engage in its lengthy analysis of whether Johnson could prove agency through a "symbiotic relationship" between McNeese and the government or agency based upon a tacit or implicit "pre-arrangement" between the government and McNeese to provide McNeese with benefits in return for obtaining incriminating evidence about other prisoners. However, the court based its finding of agency prior to September 11, 2000, *solely* on the these grounds, because the record plainly did not support a finding of agency under the "bright line rule" stated in *Moore. See United States v. Johnson*, 196 F.Supp.2d 795, 863–871 (N.D.Iowa 2002), *rev'd,* 338 F.3d 918, *and rev'd,* 352 F.3d 339 (8th Cir.2003), *cert. denied,* —— U.S. ——, 125 S.Ct. 76, 160 L.Ed.2d 45 (2004).

Second, the Eighth Circuit Court of Appeals expressly found as follows:

If the *Moore* opinion is applied as written, Ms. Johnson's position cannot prevail in the present case. *Mr. McNeese was not, at any time before September 11, 2000, instructed, either in express words or by implication, to get information about Ms. Johnson.* Mr. McNeese had been helpful to the government in the past. He had proved himself an expert interrogator and informant. We may assume that the government, when Mr. McNeese was placed in the same institution with Ms. Johnson, hoped that Mr. McNeese might come up with something helpful, especially as, at that time, the bodies of the murder victims had not been found. *All of these facts, however, when taken together, do not amount to an instruction to Mr. McNeese to get information about Ms. Johnson in particular.*

*United States v. Johnson,* 338 F.3d 918, 921 (8th Cir.2003) (emphasis added). Thus, the Eighth Circuit Court of Appeals expressly held that the record *did not* support a finding that McNeese was an agent prior to September 11, 2000, using the correct test from *Moore.* This court is not entitled to second-guess or overrule that determination.

In light of this court's prior decision and the decision of the Eighth Circuit Court of Appeals on appeal, there is nothing left for this court to find and Johnson's first motion relating to McNeese's evidence must be denied.

### 3. The motion in limine for evidence suppressed as to the first indictment

Johnson's second motion pertaining to evidence obtained by McNeese is her November 16, 2004, Motion In Limine Re: Evidence Suppressed As To First Indictment (docket no. 209). The government has, likewise, resisted this motion.

#### a. Arguments of the parties

In support of this motion, Johnson asserts that, in light of rulings of the Eighth Circuit Court of Appeals and this court, the statements that Robert McNeese obtained from her before and after September 11, 2000, are admissible as to all counts in Case No. CR 01–3046–MWB, but only statements obtained prior to September 11, 2000, are admissible in Case No. CR 00–3034–MWB. Because the government has not severed the two cases for separate trials, however, she contends that the statements obtained after September 11, 2000, are not admissible in a joint trial pursuant to *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), and *Texas v. Cobb,* 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001). More specifically, Johnson argues that *Moulton* and its progeny require exclusion of the incriminating statements obtained by McNeese after September 11, 2000, in a joint trial on both indictments, and that she has found no authority for permitting the admission of such evidence with a limiting instruction. In any event, she argues that any such limiting instruction would be inadequate to protect her Sixth Amendment rights in the circumstances presented here, because the jury would be unable to separate the evidence where both indictments relate to the murders of the same five people.

Next, she argues that her Sixth Amendment right to counsel did attach to some or all of the offenses charged in the second indictment, because they are "the same offenses" as the ones charged in the first indictment for Sixth Amendment purposes. This is so, she contends, because proof of the murders charged in the first indictment necessarily establishes the elements of the killings charged in the second indictment. Furthermore, she argues that the conspiracy charged in Count 7 of the first indictment is also part of the agreement embodied in the CCE murder counts of the second indictment. She also contends that the offenses are "the same," because she cannot be sentenced for multiple convictions that are variations of murder of the same person. Therefore, she contends that the statements obtained after September 11, 2000, are not admissible as to the charges in the second indictment in any event.

Johnson also argues that the second indictment is the fruit of the Sixth Amendment violation that occurred when the first indictment was pending. The second indictment, she asserts, was a mere legal contrivance to avoid suppression of evidence and, as such, was not the result of a good faith investigation into the offenses. She contends that this is not a situation in which evidence obtained in investigation of a charged defendant for other offenses

could be used against the defendant in the prosecution of those other offenses. Rather, she contends that the situation here is that the government deliberately violated her Sixth Amendment rights, then filed a new indictment for offenses that were not under investigation until the violation of her rights occurred, and did so to avoid the taint on the evidence. She likens the situation here to use of a lawful search warrant obtained without reference to a prior illegal search, in which the second warrant is fruit of the poisonous tree.

Her arguments not yet exhausted, Johnson also argues that the double jeopardy clause requires exclusion of the incriminating statements in a joint trial of charges in both indictments. This is so, she contends, because prosecution of the two indictments in a single trial may allow for multiple judgments and for cumulative sentences to be imposed. She contends that *Garrett v. U.S.*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), is not to the contrary. She argues that *Garrett* did not hold that it was permissible to prosecute a defendant for a CCE offense after a prior prosecution for an underlying drug offense, on the ground that Congress had intended the CCE offense to be a separate, prosecutable offense, but on the ground that the CCE offense was not completed and had continued after the date of the prior offense. She also contends that *Garrett* is distinguishable, in any event, because it dealt with 21 U.S.C. § 848 before the amendment to add the "CCE murder" offense. She contends that use of the statements violates *Texas v. Cobb*, 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), because McNeese's interrogation concerned the very offenses charged in the first indictment, and the second indictment is part of the same prosecution.

Finally, Johnson argues that Rule 403 of the Federal Rules of Evidence bars admission in a joint trial of the incriminating statements obtained by McNeese, because the post-September 11, 2000, statements are unfairly prejudicial as to the charges in the first indictment, outweighing any probative value, because the jury would be unable to compartmentalize evidence that is admissible as to only some counts.

The government contends that the dismissal of the murder counts in the first indictment renders Johnson's motion moot. The government acknowledges that Johnson's motion was filed the day after the court filed its order granting the government's motion to dismiss those counts, so that Johnson probably wasn't aware that her arguments were moot. Moreover, the government contends that the Eighth Circuit Court of Appeals has explicitly rejected the defendant's argument that she had Sixth Amendment rights with respect to the second indictment. Finally, the government argues that the evidence in question is admissible at trial, even though Johnson did have a Sixth Amendment right to counsel as to Counts 6 and 7 of the first indictment, because the evidence obtained by McNeese does not pertain to Count 6 or what remains of Count 7 (now Counts 11 and 12 of the second superseding indictment in Case No. CR 01–3046–MWB).

### b. Analysis

The court agrees with the government that Johnson's motion to exclude from trial evidence suppressed as to the first indictment is now moot. Where the government has dismissed the charges and parts of charges of the indictment in Case No. CR 00–3034–MWB as to which suppression applied—those charges involving the murders of or conspiracy to murder Nicholson, the Duncans, and DeGeus—there is no difficulty with trying the remaining charges, in their amended form, with the original ten charges of the indictment in

Case No. CR 01–3046–MWB, as to which the Eighth Circuit Court of Appeals concluded the evidence need not be suppressed. To the extent that either this court or the Eighth Circuit Court of Appeals stated that McNeese's evidence was suppressed "as to the first indictment," rather than to particular counts of the first indictment, it should be clear that both courts meant that the evidence was suppressed as to counts of the first indictment as to which McNeese obtained any relevant evidence. Johnson has not identified any evidence obtained by McNeese that pertains to Count 6 of the indictment in Case No. CR 00–3034–MWB, now Count 11 of Case No. CR 01–3046–MWB, or to what remains of Count 7 of the indictment in Case No. CR 00–3034–MWB in Count 12 of Case No. CR 01–3046–MWB. Furthermore, the court agrees with the government that the Eighth Circuit Court of Appeals has expressly rejected all of the arguments that Johnson now reiterates in support of her contention that charges in the indictment in Case No. CR 01–3046–MWB are "the same" as the charges in Case No. CR 00–3034–MWB. *See United States v. Johnson,* 352 F.3d 339, 343–44 (8th Cir.2003), *cert. denied,* — U.S. —, 125 S.Ct. 76, 160 L.Ed.2d 45 (2004). Johnson's motion will be denied as moot.

#### 4. The motion to suppress McNeese's evidence

Johnson's last motion pertaining to evidence obtained by McNeese is her Motion To Suppress (docket no. 210), as amended November 17, 2004 (docket no. 211). In that motion, Johnson seeks to suppress statements made by Johnson to McNeese on the ground that the statements were obtained in violation of Johnson's Fifth Amendment right to counsel as guaranteed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government also resisted this motion.

#### a. Additional evidence

This is the only motion heard on December 20, 2004, as to which either party offered any additional evidence. As to this motion, Johnson presented her own testimony that she invoked her Fifth Amendment right to counsel, immediately after being read her *"Miranda* rights" at the time of her arrest in July 2000, again when arresting officers attempted to talk to her about the case while transporting her to the Benton County jail after her arrest, and, finally, when she was "booked in" at the Benton County Jail. She also testified that she never waived those rights.

#### b. Arguments of the parties

In support of this motion, Johnson asserts that her Fifth Amendment right to counsel, as guaranteed by *Miranda,* is not "offense specific," but prevents any further police interrogation about any investigation unless counsel is present. She contends that she was "in custody" and that she was "interrogated" under *Miranda,* because deliberate attempts by McNeese, a government agent, to obtain incriminating statements from her constituted "interrogation." She contends that the government deliberately placed her near McNeese so that he could interrogate her, so the government is responsible for the interrogation. She contends, further, that the Supreme Court held in *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), that conversations between a suspect and an undercover agent posing as an inmate did not require the issuance of a *Miranda* warning, but the Court was not presented with the question of whether or not the defendant in that case waived his Fifth Amendment right to counsel. When the state court concluded that the defendant had asserted, and never waived, his Fifth Amendment right, the Supreme Court declined to hear the case.

Here, Johnson contends that she asserted, then never waived her Fifth Amendment right to counsel. She could not waive that right simply by responding to or initiating conversations with an undercover agent like McNeese.

In response, the government contends that both this court and the Eighth Circuit Court of Appeals have rejected Johnson's Fifth Amendment argument. The government notes that Johnson raised her Fifth Amendment argument in her motion to suppress the information obtained by McNeese, and the government responded to that argument. The government points out, further, that this court premised its suppression of evidence only on violation of the Sixth Amendment, expressly rejected all other grounds asserted by Johnson as "unpersuasive," and expressly denied each of Johnson's alternative grounds for suppression. The government also points out that Johnson raised her Fifth Amendment argument in her appellate brief, the government responded to that argument in its reply, and that the Eighth Circuit Court of Appeals summarized and expressly rejected her argument. Specifically, the government points out that the appellate court noted that conversations between a defendant and a jailhouse informant do not fit the *Miranda* doctrine, and that Johnson's lawyer had warned her not to talk to anyone, but she still chose to talk to McNeese, even though her lawyer had expressly told her that McNeese was a known informant. In light of these circumstances, the appellate court concluded that "[t]here was no Fifth Amendment violation." *United States v. Johnson*, 352 F.3d 339, 342–43 (8th Cir.2003). The government also points out that, in *Perkins*, the Supreme Court held that the Fifth Amendment is not violated when a defendant freely gives a statement to someone that the defendant believes is a fellow inmate.

### c. *Analysis*

This court concludes that it need look no further than the ruling of the Eighth Circuit Court of Appeals on the government's interlocutory appeal of this court's ruling suppressing McNeese's evidence. After noting that the "major issue" on appeal was Johnson's Sixth Amendment right to counsel, the appellate court wrote,

> Separately, however, [Johnson] urges that the reception of Mr. McNeese's testimony would violate the Fifth Amendment, part of which protects her privilege against self-incrimination. She was in custody when Mr. McNeese talked with her, their conversations, she argues, were an interrogation of her on his part, and she had not been given Miranda warnings with respect to the charges contained in the second indictment.

> We reject this argument. Conversations between a defendant and a jailhouse informant simply do not fit the *Miranda* doctrine. By hypothesis, the defendant does not know that the fellow inmate with whom she is speaking is going to testify against her. If she did know it, she certainly would not speak with him. If the jailhouse informant, or some other person, should give the defendant a *Miranda* warning immediately before the informant began conversing with her, the whole purpose of the undercover operation would be destroyed. And it is well settled that such operations are lawful, so long as they do not run afoul of the Sixth Amendment right to counsel. It makes no sense to require that a jailhouse informant, whether acting as a government agent or not, warn a defendant that anything she says to him can be used against her. We observe, in addition, that there is no evidence of coercion here. Ms. Johnson did not have to speak with Mr.

McNeese. Indeed, her lawyer had warned her not to talk to anybody about her case, and she was specifically instructed not to talk to Mr. McNeese, as he was a known police informant. Acting on her own volition, she disregarded the advice of her lawyer and volunteered information to Mr. McNeese. *See, e.g., Illinois v. Perkins,* 496 U.S. 292, 298–99, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (that an accused has been lulled into believing that a jailhouse informant was sympathetic did not affect the voluntariness of his statements). We find it especially persuasive that much of the incriminating information was passed in the form of notes written by Ms. Johnson. She had plenty of time to think about these notes before sending them. She was acting voluntarily. There was no Fifth Amendment violation.

*Johnson,* 352 F.3d at 342–43. Thus, the Eighth Circuit Court of Appeals addressed and rejected the arguments that Johnson is attempting to reassert here.

Because the issues have already been considered and rejected by the Eighth Circuit Court of Appeals, Johnson's last motion pertaining to the evidence obtained by McNeese must also be denied.

5. ***Request for Honken trial transcript***

■ The last motion now pending before the court is Johnson's November 20, 2004, Application [For] Preparation Of Trial Transcript In *United States v. Honken* (docket no. 216). In support of this motion, Johnson contends that the majority of the government's witnesses in Honken's trial will also be testifying in Johnson's trial. Because she is indigent, she requests that the court grant her application for a transcript of Honken's trial, so that she can adequately prepare for the testimony of the government witnesses who testified in that case and who will also testify in hers. The government filed no

written response to the motion and expressly stated on the record during the December 20, 2004, hearing that it had no objection to the motion. The court finds that Johnson has established good cause for the relief requested in this motion. Therefore, it will be granted.

### III. CONCLUSION

At the end of its long and arduous journey, after treading both familiar terrain and terra incognita, the motions filed on or before December 7, 2004, and heard on December 20, 2004, in docket number order, are resolved as follows:

1. The government's February 23, 2004, Motion In Limine Regarding Alibi Defense (docket no. 187) is **granted** to the extent that Johnson will not now be permitted to present any testimony of any witness—other than herself—that she was *at locations outside the Mason City area or at any location such that she could not have committed the charged murders* at the times identified in the government's request for notice of alibi defense, unless she demonstrates that she did not learn of the witness or could not have learned of the witness through reasonable diligence prior to the time a disclosure is offered. Johnson may also present her own testimony as to her whereabouts, any non-testimonial evidence of her whereabouts, and argument in support of an alibi defense premised on such evidence. Finally, Johnson may present evidence as to her whereabouts *in the Mason City area* at the times identified in the government's request for notice of alibi defense.

2. The government's May 25, 2004, Renewed Motion For Anonymous Jury And Request For Court Order (docket no. 197, which renews docket no. 188) has **withdrawn** and is, consequently, **denied as moot**. Johnson's counsel will be given the full disclosures ordinarily required by

18 U.S.C. § 3432. However, the prospective jurors and the jurors ultimately selected to serve in this case will be identified in court only by numbers.

3. The government's November 3, 2004, Renewed Motion To Introduce Evidence Of Defendant's Attempted Suicide (docket no. 203) is **granted** to the extent that the government may introduce such evidence for the purpose of showing Johnson's "consciousness of guilt" for the murders. The government may not, however, argue for any other inference to be drawn from that evidence and is expressly precluded from making any argument, in the "merits phase" or the "penalty phase," if any, on the basis of this evidence, to the effect that the jury should "finish what Johnson started."

4. Defendant Johnson's November 4, 2004, Motion For Change Of Venue (docket no. 204), which Johnson supplemented, at the court's direction, on December 4, 2004 (docket no. 227), is **denied** to the extent that it seeks a change of venue pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, but **ruling is reserved** on this motion to the extent that the motion seeks a change of venue pursuant to Rule 21(a). The court will reserve the issue of a change of venue pursuant to Rule 21(a) until such time as the parties and the court have had the opportunity to review juror questionnaires from potential jurors in the Western Division and Eastern Division (including the Cedar Rapids, Waterloo, and Dubuque subdivisions) of the Northern District of Iowa, or until such time as monitoring of on-going pretrial publicity concerning Johnson's case or post-trial publicity concerning Honken's case can be shown to justify a presumption of prejudice requiring a change of venue. The precise counties in each division in which the juror questionnaires will be disseminated will be determined in consultations with the parties.

5. The government's November 15, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Out Of Court Statements Made By Decedents Gregory Nicholson And Terry DeGeus (docket no. 207) is **granted** to the extent that

a. The statements by DeGeus in question here are admissible, either pursuant to the "state of mind" exception, or conditionally pursuant to the "forfeiture by wrongdoing" exception under Rule 804(b)(6) and the common law and the procedures outlined in *United States v. Emery*, 186 F.3d 921 (8th Cir.1999), *cert. denied*, 528 U.S. 1130, 120 S.Ct. 968, 145 L.Ed.2d 839 (2000), or both; and

b. The statements by Nicholson at issue here are also conditionally admissible pursuant to the "forfeiture by wrongdoing" exception under Rule 804(b)(6) and the common law and the procedures outlined in *Emery*.

6. Defendant Johnson's November 16, 2004, Motion For Factual Findings Re: Instructions To Elicit (docket no. 208) is **denied as moot** in its entirety.

7. Defendant Johnson's November 16, 2004, Motion In Limine Re: Evidence Suppressed As To First Indictment (docket no. 209) is **denied as moot** in its entirety.

8. Defendant Johnson's Motion To Suppress (docket no. 210), as amended November 17, 2004 (docket no. 211), is **denied as moot** in its entirety.

9. Defendant Johnson's November 20, 2004, Application [For] Preparation Of Trial Transcript In *United States v. Honken* (docket no. 216) is **granted**. Defense counsel shall submit a CJA voucher for payment for the transcript.

10. The government's December 3, 2004, Motion In Limine To Bar Discussion

Or Evidence Of Certain Aspects Of The Death Penalty (docket no. 224) is **granted in part, reserved in part, and denied in part** as explained more fully herein.

11. The government's December 3, 2004, Motion In Limine Regarding Timothy Cutkomp's Instances Of Public Exposure (docket no. 225) is granted to the extent that the parties, counsel, and witnesses may not make any reference to, ask questions concerning, or introduce evidence of witness Timothy Cutkomp's past behavior of indecent exposure. Should it become necessary to refer to these instances at all, they may be referred to as "a misdemeanor conviction" and "acts constituting misdemeanor violations of the law."

12. The government's December 3, 2004, Rule 104(c) Motion For Admission Of A Replica Firearm (docket no. 226) is **reserved for trial** until the court can assess whether the government has established the admissibility, for demonstrative purposes, of a replica of a Tec–9 semi-automatic pistol.

**IT IS SO ORDERED.**